STATE OF NORTH CAROLINA v. ANTHONY MAURICE BONE

No. 281A99

(Filed 17 August 2001)

**1. Search and Seizure— defendant's shoes—confession— plain view doctrine—exigent circumstances—search incident to lawful arrest**

Although the trial court improperly concluded a magistrate had probable cause to issue a search warrant to seize defendant's shoes in a first-degree burglary and capital first-degree murder trial, other proper grounds were available to uphold the seizure including: (1) the plain view doctrine coupled with exigent circumstances when defendant could discard or disfigure the shoes once he had knowledge of the detective's interest in the shoes; and (2) the search was incident to a lawful arrest when the detective had probable cause to arrest defendant based on an anonymous tip that the detective was able to corroborate, the detective independently had reason to believe the murderer wore "Chuck Taylor" shoes, and the detective found defendant wearing this type of shoe when he went to speak with him.

**2. Confessions and Incriminating Statements— voluntariness—alleged misstatements and false promise by detective**

The trial court did not err in a first-degree burglary and capital first-degree murder trial by denying defendant's motion to

1

suppress his confession even though defendant contends it was involuntary when it was induced by alleged misstatements and a false promise by a detective, because: (1) the detective's representations that shoe prints were just like fingerprints and that defendant's shoes matched those impressions found at the murder scene were exaggerations, but not outright fabrications; (2) although the detective made no promises to defendant in exchange for a confession during defendant's initial interview but told defendant he might receive a lesser sentence if he confessed, the detective made no commitment and defendant made no statement in response to this suggestion; and (3) defendant asked to speak to an officer only after he was formally arrested where he was given his Miranda rights and signed a written waiver.

**3. Sentencing— capital—consideration of mitigating circumstances—erroneous instruction—harmless error**

Any error by the trial court during a capital sentencing proceeding by its instruction in Issue Three that each juror may consider any mitigating circumstance that the "jury" rather than "juror" determined to exist by a preponderance of the evidence in Issue Two did not preclude an individual juror from considering mitigating evidence that such juror alone found in Issue Two and was harmless where the jury was clearly instructed for each of the mitigating circumstances submitted in Issue Two that only one or more of the jurors was required to find that the mitigating circumstance existed and that it was deemed mitigating.

**4. Sentencing— capital—mitigating circumstances—no significant history of prior criminal activity**

The trial court did not commit prejudicial error during a capital sentencing proceeding by submitting to the jury the N.C.G.S. § 15A-2000(f)(1) mitigating circumstance that defendant has no significant history of prior criminal activity even though defendant neither requested nor objected to the submission of this circumstance and defendant had four prior convictions for violent felonies, because: (1) there are no extraordinary facts that make any error by the trial court in giving this instruction prejudicial to defendant; (2) it is not error to submit the (f)(1) mitigating circumstance where a defendant's prior convictions are also used to support the submission of the N.C.G.S. § 15A-2000 (e)(3) aggravating circumstance that defendant has been previously convicted of a felony involving the use or threat of violence to the person; and (3) it is inconceivable that the jury would have

returned a different verdict if the (f)(1) mitigating circumstance had not been submitted to the jury.

## 5. Sentencing— capital—death penalty proportionate

The trial court did not err by imposing the death sentence in a first-degree murder case, because: (1) defendant was convicted under the theory of premeditation and deliberation as well as the theory of felony murder; (2) defendant had a history of prior violent felony convictions; (3) defendant's actions at the scene of the robbery were consistent with an intentional killing; (4) the murder took place at the elderly victim's home; (5) the jury found the N.C.G.S. § 15A-2000 (e)(3) and (e)(5) aggravating circumstances, each of which is alone sufficient to support a death sentence; (6) defendant took no steps to seek help for the victim; and (7) the fact that defendant's IQ fell in the borderline range does not affect this conclusion.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Steelman, J., on 5 February 1999 in Superior Court, Guilford County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 14 March 2001. On 1 September 2000, the Supreme Court allowed defendant's motion to bypass the North Carolina Court of Appeals as to additional judgments.

*Roy A. Cooper, Attorney General, by William P. Hart, Special Deputy Attorney General, and Robert C. Montgomery, Assistant Attorney General, for the State.*

*Staples Hughes, Appellate Defender, by Benjamin Dowling-Sendor, Assistant Appellate Defender, for defendant-appellant.*

EDMUNDS, Justice.

Defendant Anthony Maurice Bone was convicted for the first-degree murder of Ethel McCracken based upon theories of premeditation and deliberation and of felony murder. He also was convicted of two counts of first-degree burglary. On 5 February 1999, following a capital sentencing proceeding, the jury recommended a sentence of death for the murder, and the trial court entered judgment accordingly. The trial court also imposed two consecutive terms of imprisonment of 146 months to 185 months for the burglary convictions.

**STATE v. BONE**

[354 N.C. 1 (2001)]

At trial, the State's evidence showed that on the morning of 24 August 1997, a family friend found eighty-eight-year-old Ms. McCracken dead in her apartment at 703 Rockett Street in Greensboro, North Carolina. She was wearing a nightgown and lying face down on her bed. Her feet had been bound with curtains, and curtain material had been stuffed into her mouth. Her hands, legs, and face were bloody. Two pocketbooks found on the floor of the living room had been emptied, and a third was discovered open on the dining room table. The screen on the kitchen window had been cut.

A police dog followed a scent from Ms. McCracken's apartment to the rear of a nearby apartment building where Wesley Crompton resided. That morning, Mr. Crompton had reported a burglary after he awoke to find the screen of his bathroom window cut and the contents of his wallet scattered on his bathroom floor. Police found a flashlight, a savings account card bearing Ms. McCracken's name, and a pair of knit gloves behind Mr. Crompton's apartment.

Agents of the North Carolina State Bureau of Investigation used a dye known as "Coomassie Blue" to stain Ms. McCracken's bedroom floor. This dye allows field forensic examiners to develop latent fingerprint and shoe print impressions left in blood on a hard or reflective surface. The dye raised shoe prints that were twelve and a half inches long and four inches wide. A Greensboro Police Department crime scene technician photographed the shoe prints and removed the tiles on which the prints had been impressed. Around 26 August 1997, Detective Robin Saul of the Greensboro Police Department showed a photograph of a shoe print from Ms. McCracken's house to the manager of a sporting goods store in Greensboro and asked him to identify the type of shoe that could have made the print. The manager recognized the print pattern as having been made by a Converse shoe. Detective Saul and the manager then compared the photograph to a Converse Model 961 "Chuck Taylor" athletic shoe in the store and determined that such a "Chuck Taylor" shoe made the print on Ms. McCracken's bedroom floor. The store manager allowed Detective Saul to borrow a "Chuck Taylor" shoe.

Police began surveillance operations in high-crime areas around the victims' neighborhood. In early October 1997, the Greensboro Police Department received an anonymous tip from a caller who identified defendant as the murderer. When Detective Saul pursued this lead, he found defendant wearing a pair of "Chuck Taylor" shoes.

As detailed below, Detective Saul subsequently arrested defendant and seized his shoes.

SBI Special Agent Joyce Petzka testified that the shoes seized from defendant were consistent in sole design and size with the shoe prints found at the murder scene. The seized shoes had additional wear that was not present in the impressions taken at the scene, but Agent Petzka testified that such differences were consistent with defendant's shoes having been worn for approximately six weeks after the murder.

The forensic pathologist who performed the autopsy of Ms. McCracken testified that the primary cause of death was the fracture of her cervical spine, which most likely resulted from someone pulling her neck back. There was also some element of strangulation. In addition, Ms. McCracken suffered broken ribs, and the pathologist testified that he found blood below her right ear, in the right ear itself, and in front of the left ear.

The State introduced into evidence a statement made by defendant when he was arrested. Defendant told Detective Saul that on the night of 23 August 1997, he cut the screen covering an open window of an apartment on Rockett Street. Once inside, he encountered the victim in her bedroom. Defendant ripped a curtain off the wall, rolled the victim onto her stomach, and tied her hands behind her back. To prevent her from getting up or making noise, defendant put his hands on the victim's neck, then gagged her. After searching the apartment for money, defendant noticed the victim was bleeding. He exited the apartment through the back door, taking a flashlight with him. Defendant walked to another apartment, which he entered by raising a window. Finding an old man sleeping in a chair in the living room and a wallet containing eight or nine dollars, defendant took the money to buy crack cocaine.

Defendant testified in his own behalf and denied breaking into any apartment and denied killing Ms. McCracken. Defendant also presented the testimony of psychologist Claudia Coleman. Her testimony will be discussed in detail below.

## GUILT-INNOCENCE PHASE

Defendant's only assignments of error in the guilt-innocence phase of his trial pertain to the trial court's denial of his motion to suppress his confession. He contends that the confession was obtained in violation of the Fourth Amendment to the United

States Constitution; Article I, Section 20 of the North Carolina Constitution; and article 11 of chapter 15A of the North Carolina General Statutes.

Detective Saul's investigation indicated that the murderer was wearing Converse "Chuck Taylor" athletic shoes. In early October, an anonymous caller reported that defendant had committed the crime. At trial, Detective Saul gave the following account of this tip:

> [T]he nature of the call is a homicide. The location Rockett Street. . . . [T]he caller reports that Tony Bone, black male, late 20s, climbed in an open window, punched an elderly female in the face so hard her ears bled, got only $5 out of the crime. He works for a moving company in Greensboro, and lives in Trinity, North Carolina. Suspect is married and recently released from prison.

Detective Saul was able to verify almost all of the information in the tip before he approached defendant. He learned that defendant was married and worked at Allied Moving in Greensboro. A criminal history check revealed defendant had been released from prison approximately a year before Ms. McCracken's murder. The cut screen found by investigators at the scene indicated the killer gained access to her apartment through a window. Detective Saul knew that while the primary cause of death was a broken neck, the victim was found with blood on her face. The only incorrect information provided by the anonymous caller was that defendant lived in Trinity, North Carolina. Defendant actually lived with his wife in Liberty, North Carolina; however, both Liberty and Trinity are small communities in northern Randolph County.

In response to the tip, on 8 October 1997, Detective Saul undertook surveillance of Allied Moving's place of business. After observing defendant entering the workplace, Detective Saul asked to speak with him. When defendant came out onto a loading dock to meet the detective, he was wearing Converse "Chuck Taylor" athletic shoes. Detective Saul asked defendant if he would accompany him downtown to speak about an undisclosed matter. Defendant agreed and rode to the Greensboro Police Department with a uniformed officer, while Detective Saul drove his own unmarked police car.

Once inside an interview room at the Criminal Investigations Division of the Greensboro Police Department, Detective Saul advised defendant that he was investigating the murder of Ms.

McCracken. He stated that he needed defendant's assistance and asked if he could examine defendant's shoes. Defendant refused, so Detective Saul determined to seek a search warrant. When he went to find a magistrate, Detective Saul left defendant in the interview room with the door closed but unlocked. Unknown to defendant, the uniformed officer who had driven him to the interview was "left there with [defendant] outside the room." Detective Saul returned after approximately one hour and twenty minutes to serve the search warrant on defendant, who then surrendered his shoes.

Detective Saul again left the now-unshod defendant in the interview room with the door closed and immediately took the shoes to the Greensboro Police Laboratory where he compared defendant's shoes to the photographs of the shoe impressions found at the murder scene. Detective Saul believed the shoes and shoe prints were similar. After nearly two hours, Detective Saul returned to the interview room and advised defendant of his *Miranda* rights. Defendant verbally waived his rights but refused to sign a waiver form. During the ensuing interrogation, which lasted approximately an hour and a half, Detective Saul told defendant that he believed defendant killed the victim, adding that shoe prints are "just like" fingerprints and that defendant's sneakers "matched" the shoe prints. Defendant made no incriminating statements.

Detective Saul formally placed defendant under arrest and arranged for him to be taken before a magistrate so an arrest warrant could be issued. Subsequently, the uniformed officer who served the arrest warrant on defendant notified Detective Saul that defendant wanted to speak with him. Detective Saul again advised defendant of his *Miranda* rights, and defendant signed a written waiver. Defendant then confessed to the murder and burglaries. Defendant now argues that the trial court's denial of his motion to suppress his confession was error because his confession was induced by an unconstitutional seizure of his shoes, by an arrest without probable cause, and by an improper interrogation conducted by Detective Saul. We address these contentions *seriatim*.

The scope of review of the denial of a motion to suppress is "strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). Defendant does not challenge the findings of fact made by the trial

court in its order; instead, he questions whether those findings of fact support legally correct conclusions of law. Based upon its findings of fact, the trial court made alternative conclusions of law supporting the seizure of defendant's shoes. After a careful review of the record, we conclude that one conclusion of law made by the trial court was erroneous but that the second was sound. We additionally conclude that further grounds, not articulated by the trial court, also justify the seizure. "The question for review is whether the ruling of the trial court was correct and not whether the reason given therefor is sound or tenable. The crucial inquiry for this Court is admissibility and whether the ultimate ruling was supported by the evidence." *State v. Austin*, 320 N.C. 276, 290, 357 S.E.2d 641, 650 (citation omitted), *cert. denied*, 484 U.S. 916, 98 L. Ed. 2d 224 (1987).

[1] As its first ground for concluding that the seizure of defendant's shoes was lawful, the trial court found that the magistrate had probable cause to issue the search warrant on the basis of the application and affidavit submitted by Detective Saul. After reviewing the contents of the affidavit as recited in the transcript of the motion to suppress, we cannot agree; indeed, the State does not argue on appeal that the magistrate had probable cause to issue a search warrant based upon the application and affidavit. The affidavit does little more than provide a conclusory statement that defendant had been developed as a suspect and that his shoes match the pattern found at the murder scene. Although, as we discuss below, probable cause existed to arrest defendant at the time Detective Saul asked to examine defendant's shoes, this probable cause was not evident in the application and affidavit submitted to the magistrate.

As its second ground for upholding the seizure, the trial court reasoned that "Detective Saul was authorized to seize Defendant's shoes without a search warrant, under the plain view doctrine. No search was involved since the shoes were in plain view." We agree that the seizure was justified under the plain view doctrine, coupled with exigent circumstances. In North Carolina, a seizure is lawful under this doctrine when the officer was in a place he or she had a right to be at the time the evidence was discovered, it is immediately obvious that the items observed are evidence of a crime, and the discovery is inadvertent. *State v. Mickey*, 347 N.C. 508, 495 S.E.2d 669, *cert. denied*, 525 U.S. 853, 142 L. Ed. 2d 106 (1998). Here, Detective Saul was entirely within his rights when he asked to see defendant at his place of employment. When he observed that defendant was wearing "Chuck Taylor" shoes, Detective Saul realized that they were

evidence because the perpetrator of the crime had worn such shoes. The discovery was inadvertent because Detective Saul had no reason to know that defendant would be wearing "Chuck Taylor" shoes when he asked to speak to him. Finally, there is an element of exigent circumstance in the seizure. Because, as we hold below, defendant was arrested only at the moment Detective Saul seized his shoes, up until that point defendant was free to leave the Greensboro Police Department. Armed with his new knowledge of the investigator's interest in the shoes, he could have discarded them or tampered with the tread. *See Harjo v. State*, 882 P.2d 1067 (Okla. Crim. App. 1994), *cert. denied*, 514 U.S. 1131, 131 L. Ed. 2d 1007 (1995). In *Harjo*, the defendant broke into the home of an elderly victim, strangled her, and stole her car. Distinctive shoeprints left by the perpetrator at the scene matched the tread of the shoes the defendant was wearing when questioned. The Oklahoma court held that the police had probable cause to believe that the shoes were evidence of a crime, and because the defendant could discard or disfigure the shoes, exigent circumstances existed to justify an immediate seizure.

We agree with the analysis in *Harjo*. Detective Saul had two choices when defendant refused to hand over the shoes voluntarily—either seize them anyway or apply for a search warrant. We do not second-guess Detective Saul's decision to seek out a neutral and detached magistrate. His decision to do so did not vitiate the exigency of the circumstances. Accordingly, in the case at bar, Detective Saul properly seized the shoes pursuant to the plain view doctrine.

Detective Saul's actions in seizing defendant's shoes also may be justified as a search incident to a lawful arrest. As a general rule, "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Camara v. Municipal Court*, 387 U.S. 523, 528-29, 18 L. Ed. 2d 930, 935 (1967). One such exception to the warrant requirement is the right of an arresting officer to search his arrestee as an incident of the arrest. *Chimel v. California*, 395 U.S. 752, 23 L. Ed. 2d 685 (1969); *State v. Hardy*, 299 N.C. 445, 263 S.E.2d 711 (1980). " 'In the course of [a] search [incident to arrest], the officer may lawfully take from the person arrested any property which such person has about him and which is connected with the crime charged or which may be required as evidence thereof.' " *State v. Harris*, 279 N.C. 307, 310, 182 S.E.2d 364, 366-67 (1971) (quoting *State v. Roberts*, 276 N.C. 98, 102, 171 S.E.2d 440, 443

(1970)). "Further, a search may be made before an actual arrest and still be justified as a search incident to arrest, if, as here, the arrest is made contemporaneously with the search." *State v. Brooks*, 337 N.C. 132, 145, 446 S.E.2d 579, 587 (1994) (citing, *inter alia, Rawlings v. Kentucky*, 448 U.S. 98, 65 L. Ed. 2d 633 (1980)).

Accordingly, we must consider whether Detective Saul had probable cause to arrest defendant before seizing his shoes. Although Detective Saul testified at the suppression hearing that he did not believe he had probable cause to arrest defendant before he seized his shoes,

> [Detective Saul's] subjective opinion is not material. Nor are the courts bound by an officer's mistaken legal conclusion as to the existence or non-existence of probable cause or *reasonable* grounds for his actions. The search or seizure is valid when the objective facts known to the officer meet the standard required.

*State v. Peck*, 305 N.C. 734, 741, 291 S.E.2d 637, 641-42 (1982); *see also Scott v. United States*, 436 U.S. 128, 56 L. Ed. 2d 168 (1978).

> "Probable cause for an arrest has been defined to be a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty. . . . To establish probable cause the evidence need not amount to proof of guilt, or even to prima facie evidence of guilt, but it must be such as would actuate a reasonable man acting in good faith."

*Harris*, 279 N.C. at 311, 182 S.E.2d at 367 (quoting 5 Am. Jur. 2d *Arrests* § 44 (1962)) (alteration in original). Probable cause "deal[s] with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175, 93 L. Ed. 1879, 1890 (1949).

The record establishes that Detective Saul had probable cause to arrest defendant before he seized defendant's shoes. In making an arrest, an officer "may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge." *Jones v. United States*, 362 U.S. 257, 269, 4 L. Ed. 2d 697, 707 (1960), *overruled on other grounds by United States v. Salvucci*, 448 U.S. 83, 65 L. Ed. 2d 619 (1980). This rule applies to anonymous informants as well as informants who

have supplied reliable information in the past. *Illinois v. Gates*, 462 U.S. 213, 244, 76 L. Ed. 2d 527, 552 (1983). Detective Saul was able to corroborate almost all of the information in the anonymous tip, including defendant's name, age, race, marital status, criminal status, and area of employment, as well as the street on which the victim lived. Detective Saul also knew that the murderer had entered through a window in the victim's house and that the victim was found with blood on her face; the anonymous tipster reported that the murderer had climbed in an open window and had hit the victim so hard she bled from her ears. These indicia of reliability gave credibility to the anonymous tipster. *See State v. Hughes*, 353 N.C. 200, 539 S.E.2d 625 (2000). In addition to the tip, Detective Saul independently had reason to believe the murderer wore "Chuck Taylor" shoes. When he went to speak with defendant, Detective Saul found him wearing "Chuck Taylor" shoes, providing sufficient probable cause to arrest defendant.

As noted previously, "a search may be made before an actual arrest and still be justified as a search incident to arrest, if, as here, the arrest is made contemporaneously with the search." *Brooks*, 337 N.C. at 145, 446 S.E.2d at 587 (citing *Rawlings*, 448 U.S. 98, 65 L. Ed. 2d 633). Although defendant was not formally arrested until after Detective Saul had compared defendant's shoes to the shoe-impression photographs, "[a] formal declaration of arrest by the officer is not a prerequisite to the making of an arrest." *State v. Tippett*, 270 N.C. 588, 596, 155 S.E.2d 269, 275 (1967); *see also State v. Jackson*, 280 N.C. 122, 185 S.E.2d 202 (1971). Here, defendant voluntarily agreed to be driven to the Criminal Investigations Division in Greensboro. Detective Saul told defendant he was not under arrest, and we have noted that an individual's voluntary agreement to accompany law enforcement officers to a place customarily used for interrogation does not constitute an arrest. *State v. Johnson*, 317 N.C. 343, 346 S.E.2d 596 (1986). However, Detective Saul's subsequent actions amounted to an arrest. When defendant refused to allow Detective Saul to examine his shoes, Detective Saul left defendant waiting in a windowless interrogation room with the door closed. He arranged for a uniformed police officer to remain outside the interrogation room while he obtained a search warrant. When Detective Saul returned, he seized defendant's shoes and left him in the same room with the door closed and the officer outside.

We have held that "[w]hen a law enforcement officer, by word or actions, indicates that an individual must remain in the officer's

presence . . . , the person is for all practical purposes under arrest if there is a substantial imposition of the officer's will over the person's liberty."

*State v. Zuniga,* 312 N.C. 251, 260, 322 S.E.2d 140, 145 (1984) (quoting *State v. Sanders,* 295 N.C. 361, 376, 245 S.E.2d 674, 684 (1978)) (first alteration in original) (defendant was under arrest when detained at a Knoxville, Tennessee bus station pending arrival of North Carolina law enforcement officers, even though defendant was not formally placed under arrest until he returned to North Carolina the next day). Stranded without shoes, away from work and his hometown, defendant suffered "a restraint on freedom of movement of the degree associated with a formal arrest." *State v. Gaines,* 345 N.C. 647, 662, 483 S.E.2d 396, 405, *cert. denied,* 522 U.S. 900, 139 L. Ed. 2d 177 (1997). We emphasize that the taking of defendant's shoes was qualitatively different from a seizure of other pieces of personalty such as a watch, glasses, or even some garments because, as a practical matter, defendant could not walk out barefoot or wearing only socks. Taking defendant's shoes effectively immobilized him. *See United States v. Beck,* 140 F.3d 1129, 1136 (8th Cir. 1998) ("[A]ny doubts that Beck had that he was free to drive away were extinguished when, after refusing consent to a search of his automobile, Officer Taylor ordered Beck to get out of his automobile and to stand on the side of the road."); *United States v. Gordon,* 917 F. Supp. 485, 488 (W.D. Tex. 1996) (where driver stopped in Louisiana on trip from Texas to Florida, detention of vehicle is detention of driver "because the detention relieved him of his sole means of transportation").

Based on the detention triggered by the seizure of defendant's shoes coupled with Detective Saul's preexisting probable cause, we conclude that defendant was not merely detained but was placed under arrest at the moment Detective Saul seized his shoes. Because the arrest was contemporaneous with the seizure, it was justified as a search incident to arrest. " 'In the course of [a] search [incident to arrest], the officer may lawfully take from the person arrested any property which such person has about him and which is connected with the crime charged or which may be required as evidence thereof.' " *Harris,* 279 N.C. at 310, 182 S.E.2d at 366-67 (quoting *Roberts,* 276 N.C. at 102, 171 S.E.2d at 443).

In determining that the seizure of defendant's shoes was lawful as a search incident to arrest, we necessarily hold that defendant's arrest was supported by probable cause. Therefore, we conclude that

defendant's confession was not obtained through an illegal seizure or arrest. This assignment of error is overruled.

[2] We next address whether the trial court erred in denying defendant's motion to suppress his confession based upon defendant's contention that it was not voluntary because it was induced by misstatements and a false promise made by Detective Saul. After Detective Saul returned from comparing defendant's shoes to the photographs of shoe impressions, he advised defendant of his *Miranda* rights, then questioned him for an hour and a half. During the questioning, he told defendant that his shoes "matched" the tread of the shoe prints found at the murder scene and that shoe prints were "just like" fingerprints. Detective Saul also told defendant he might get a lesser sentence if he would confess. Defendant made no incriminating statements during this interrogation. It was only after defendant was formally arrested that he asked to speak with Detective Saul and subsequently gave a confession.

A confession is admissible if it "was given voluntarily and understandingly." *State v. Schneider*, 306 N.C. 351, 355, 293 S.E.2d 157, 160 (1982). "Whether a confession is voluntary is a question of law fully reviewable on appeal." *State v. Greene*, 332 N.C. 565, 579-80, 422 S.E.2d 730, 738 (1992). Lies or trickery used by the police "are not to be condoned by the courts, but standing alone, . . . they are not sufficient to render defendant's confession inadmissible." *State v. Jackson*, 308 N.C. 549, 582, 304 S.E.2d 134, 152 (1983). "The admissibility of the confession must be decided by viewing the totality of the circumstances, one of which may be whether the means employed were calculated to procure an untrue confession." *Id.* at 574, 304 S.E.2d at 148. Other factors to be considered are "the defendant's mental capacity; whether the defendant was in custody at the time the confession was made; and the presence of psychological coercion, physical torture, threats, or promises." *Greene*, 332 N.C. at 579, 422 S.E.2d at 738.

We agree with the trial court's conclusion of law that defendant's confession was voluntary. Detective Saul's representations that shoe prints were "just like" fingerprints and that defendant's shoes "matched" those impressions found at the murder scene were exaggerations based upon his quick comparison of the photographed print with the shoes recovered from defendant rather than a proper forensic examination. The State's expert at trial was careful to clarify that shoe prints are not equivalent to fingerprints. Nevertheless, because she also testified that the shoe prints found at the scene

were consistent in size and design with the shoes seized from defendant, Detective Saul's statements to defendant were incorrect in degree but were not outright fabrications. Although Detective Saul made no promises to defendant in exchange for a confession during this initial interview, he did tell defendant that he *might* receive a lesser sentence if he confessed. However, Detective Saul made no commitment, and defendant made no statement in response to this suggestion.

Only after defendant was formally arrested did he ask another officer for an opportunity to speak further with Detective Saul. At his request for something to eat, defendant was provided coffee and crackers. Detective Saul gave defendant his *Miranda* rights for a second time, and defendant signed a written waiver. Defendant was coherent and told Detective Saul that he could read. He signed and initialed his written statement. Accordingly, we hold that the trial court correctly considered the totality of circumstances and determined on the basis of competent evidence that defendant's confession was voluntary and not triggered by any improper police conduct. *See, e.g., State v. Corley*, 310 N.C. 40, 47, 311 S.E.2d 540, 544 (1984) (under totality of circumstances test, statement by officer to the defendant that " 'things would be a lot easier on him if he went ahead and told the truth' " did not render the defendant's statement involuntary). This assignment of error is overruled.

## CAPITAL SENTENCING PROCEEDING

[3] Defendant raises two issues pertaining to his sentence. He first contends that the instruction on Issue Three, weighing mitigating circumstances against aggravating circumstances, unconstitutionally prohibited an individual juror from considering mitigating circumstances found in Issue Two by the individual juror but not by the unanimous jury. The record shows that the trial court correctly instructed jurors that they need not be unanimous to find particular mitigating circumstances under Issue Two. *McKoy v. United States*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). However, when instructing jurors as to the weighing of these circumstances under Issue Three, the trial court stated: "When deciding this issue, each juror may consider any mitigating circumstance or circumstances that *the jury* determined to exist by a preponderance of the evidence in issue two." (Emphasis added.) The pattern jury instruction, which has been approved by this Court, *State v. Lee*, 335 N.C. 244, 439 S.E.2d 547, *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994), reads: "When deciding this issue, each juror may consider any mitigating circum-

stance or circumstances that *he or she* determined to exist by a preponderance of the evidence in Issue Two." N.C.P.I.—Crim. 150.10 (1990) (emphasis added).

Although the instruction was erroneous, the error was harmless. An instruction containing an identical mistake was given in *State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995), where twenty mitigating circumstances were submitted to the jury pursuant to Issue Two. As here, the trial court instructed that " '[w]hen deciding this issue, each juror may consider any mitigating circumstance or circumstances that the *jury* determined to exist by a preponderance of the evidence in Issue Two.' " *Id.* at 122, 443 S.E.2d at 328 (alteration in original). We held that any error was harmless beyond a reasonable doubt.

> The jury was clearly and unambiguously instructed for each of the twenty mitigating circumstances submitted in Issue Two that only one or more of the jurors was required to find that the mitigating circumstance existed and that it was deemed mitigating. Thus, in order for the "jury" to find the existence of a mitigating circumstance, it was expressly clear that only one juror was required to find that circumstance. The jurors were then instructed in Issue Three that "[i]f you find from the evidence one or more mitigating circumstances, you must weigh the aggravating circumstances against the mitigating circumstances." No individual juror was therefore precluded in Issue Three from considering mitigating evidence that the juror alone found in Issue Two.

*Id.* at 123, 443 S.E.2d at 328.

In the case at bar, the trial court instructed the jury on twenty-two mitigating circumstances employing the same language used in *Robinson* on Issues Two and Three. While the pattern jury instruction should have been used, we conclude that the trial court's error was harmless beyond a reasonable doubt.

[4] Defendant next argues the trial court committed prejudicial error by submitting to the jury the mitigating circumstance contained in N.C.G.S. § 15A-2000(f)(1), that defendant has no significant history of prior criminal activity. The record indicates that defendant neither requested nor objected to the submission of this circumstance.

In capital cases, "the judge shall include in his instructions to the jury that it must consider any aggravating circumstance or circumstances or mitigating circumstance or circumstances . . . which may

be supported by the evidence." N.C.G.S. § 15A-2000(b) (1999). In determining whether to submit the (f)(1) circumstance, the court must consider "whether a rational jury could conclude that defendant had no *significant* history of prior criminal activity." *State v. Wilson*, 322 N.C. 117, 143, 367 S.E.2d 589, 604 (1998). "[T]he [trial court's] focus should be on whether the criminal activity is such as to influence the jury's sentencing recommendation." *State v. Greene*, 351 N.C. 562, 569, 528 S.E.2d 575, 580, *cert. denied*, 531 U.S. 1041, 148 L. Ed. 2d 543 (2000). In the case at bar, the evidence showed that defendant had four prior convictions for violent felonies. The oldest was a 1986 conviction for common law robbery, followed by three convictions in 1990 for robbery with a dangerous weapon, second-degree kidnaping, and assault on a law enforcement officer, all stemming from a single incident.

Although defendant argues that no rational juror could have found that he had no significant criminal history, we previously have held that submission of the (f)(1) circumstance is not necessarily error where a defendant had prior felony convictions. In *State v. Geddie*, 345 N.C. 73, 478 S.E.2d 146 (1996), *cert. denied*, 522 U.S. 825, 139 L. Ed. 2d 43 (1997), the defendant had committed two felonies fifteen and ten years before the instant offense, while a third felony was an attempt committed five years before the instant offense. We held that there was sufficient evidence to support the submission of the (f)(1) mitigating circumstance. *Id.* at 102, 478 S.E.2d at 161. In *State v. Smith*, 347 N.C. 453, 496 S.E.2d 357, *cert. denied*, 525 U.S. 845, 142 L. Ed. 2d 91 (1998), the defendant had prior convictions for breaking and entering, larceny, and arson, in addition to a history of illegal drug use. The trial court gave the (f)(1) instruction over defendant's objection. In accordance with *Walker*, we held that "the trial court did not err to defendant's prejudice by submitting the (f)(1) mitigating circumstance." *Id.* at 470, 496 S.E.2d at 367. Moreover, even if submission of the (f)(1) circumstance was error here, we have held that "[a]bsent extraordinary facts . . . , the erroneous submission of a mitigating circumstance is harmless." *State v. Walker*, 343 N.C. 216, 223, 469 S.E.2d 919, 923, *cert. denied*, 519 U.S. 901, 136 L. Ed. 2d 180 (1996).

In the case at bar, we discern no extraordinary facts that make any error by the trial court in giving this instruction prejudicial to defendant. Additionally, as defendant concedes, it is not error to submit the (f)(1) mitigating circumstance where a defendant's prior convictions are also used to support the submission of the (e)(3)

aggravating circumstance that "defendant had been previously convicted of a felony involving the use or threat of violence to the person." N.C.G.S. § 15A-2000(e)(3); *see also State v. Blakeney*, 352 N.C. 287, 531 S.E.2d 799 (2000), *cert. denied*, 531 U.S. 1117, 148 L. Ed. 2d 780 (2001). Similarly, we are not persuaded by defendant's argument that submitting the (f)(1) circumstance violated his federal constitutional right to counsel under the Sixth Amendment. *Smith*, 347 N.C. at 470, 496 S.E.2d at 367. Under the circumstances of this case, it is inconceivable that the jury would have returned a different verdict if the (f)(1) mitigating circumstance had not been submitted to the jury. *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674 (1984). This assignment of error is overruled.

## PRESERVATION ISSUES

Defendant raises five issues that he concedes have been previously decided contrary to his position by this Court. Defendant contends the statutory short-form murder indictment insufficiently charged the elements of first-degree murder and failed to specify the aggravating circumstances upon which the State would rely. However, this Court consistently has held that the short-form murder indictment is adequate to charge first-degree murder. *State v. Braxton*, 352 N.C. 158, 531 S.E.2d 428 (2000), *cert. denied*, —— U.S. ——, 148 L. Ed. 2d 797 (2001). Defendant contends the trial court erred by denying his motion for allocution. We have held that a criminal defendant does not have such a right. *State v. Green*, 336 N.C. 142, 443 S.E.2d 14, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994). Defendant argues the trial court committed plain error by using the term "satisfy" in its instructions to the jury to define a defendant's burden of persuasion for mitigating circumstances. This Court has held such an instruction proper. *State v. Payne*, 337 N.C. 505, 448 S.E.2d 93 (1994), *cert. denied*, 514 U.S. 1038, 131 L. Ed. 2d 292 (1995). Defendant argues the trial court erred by allowing the jury to refuse to give effect to nonstatutory mitigating evidence if the jury deemed the evidence not to have mitigating value. This Court has rejected defendant's argument. *Id*. Finally, defendant argues that the trial court erred by instructing the jurors on Issues Three and Four that each juror "may" consider mitigating circumstances found in Issue Two. This argument was rejected in *Lee*, 335 N.C. 244, 439 S.E.2d 547.

Defendant raises these issues for the purpose of permitting this Court to reexamine its prior holdings and also for the purpose of preserving them for possible further judicial review of his case. We

have considered these issues and find no compelling reason to depart from our prior holdings. These assignments of error are overruled.

## PROPORTIONALITY REVIEW

[5] Finally, we must determine: (1) whether the record supports the aggravating circumstances found by the jury; (2) whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2). Here, the jury found four aggravating circumstances pursuant to N.C.G.S. § 15A-2000(e)(3) and one aggravating circumstance pursuant to N.C.G.S. § 15A-2000(e)(5). As to the (e)(3) circumstances, the jury found that defendant had previously been convicted of common law robbery, assault on a law enforcement officer, second-degree kidnaping, and armed robbery, all of which are felonies involving the use or threat of violence to the person of another. As to the (e)(5) circumstance, the jury found that defendant committed the instant murder while in the commission of first-degree burglary. Our review of the record, transcripts, and briefs satisfies us that there was ample evidence to support both the submission of the aggravating circumstances to the jury and the finding of these circumstances by the jury. Our review also has failed to reveal any evidence that defendant's death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

We now consider the proportionality of defendant's sentence. In addition to the statutory aggravating circumstances discussed above, the court also submitted twenty-two mitigating circumstances, of which one or more jurors found seven: (1) defendant was under the influence of a mental or emotional disturbance; (2) defendant was suffering from a mental condition insufficient to constitute a defense but which significantly reduced his culpability; (3) defendant acknowledged wrongdoing at an early stage in the process; (4) defendant expressed remorse at an early stage and has a support system in the community;[1] (5) defendant was under the influence of cocaine to a significant degree at the time of the offense; (6) defendant did not plan to kill Ms. McCracken at the time he broke

---

1. We note that the circumstance of defendant's support system was submitted to the jury in two different numbered sections of the verdict sheet. The jury found such a support system in one section and failed to find such a support system in the other section. Out of an abundance of caution, we will assume that the jury made the finding favorable to defendant.

into her apartment; and (7) defendant suffered emotional abuse as a child.

In our proportionality review, we compare the case at bar with other cases in which we have found the death sentence to be disproportionate. *State v. McCollum*, 334 N.C. 208, 433 S.E.2d 144 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). This Court has found the death penalty disproportionate in seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

Of these seven, we address in detail those most analogous to the case at bar. In *Benson*, 323 N.C. 318, 372 S.E.2d 517, a robbery-murder case, the defendant held up the victim at a bank, firing a shotgun blast that injured the victim in the legs. The victim later died from cardiac arrest resulting from loss of blood. The murder conviction was based upon felony murder only, and the single aggravating circumstance found was that the murder was committed for pecuniary gain, (e)(6). The jury found as a mitigating circumstance that the defendant was under the influence of a mental or emotional disturbance, (f)(2); that the defendant had no significant history of prior criminal activity, (f)(1); that the defendant confessed, cooperated, and pled guilty during trial; and that the defendant had been abandoned by his mother at an early stage. We also noted that because he shot at the victim's legs, the defendant apparently did not intend to kill the victim. In the case at bar, defendant was also found to have been under the influence of a mental or emotional disturbance. However, unlike the defendant in *Benson*, defendant here was convicted under the theory of premeditation and deliberation as well as the theory of felony murder, he had a history of prior violent felony convictions, his actions at the scene of the robbery were consistent with an intentional killing, and the murder took place in the victim's home.

In *Stokes*, the defendant and three accomplices conspired to rob a businessman at his office. During the robbery, the victim was fatally beaten. The defendant was found guilty under the theory of felony murder and was sentenced to death. We found no error in the guilt-

innocence phase but ordered a new sentencing hearing. *State v. Stokes*, 308 N.C. 634, 304 S.E.2d 184 (1983), At that hearing, the defendant presented evidence that he had been diagnosed as being borderline mentally retarded with a full-scale IQ of 70. The jury found as mitigating circumstances that the defendant had no significant history of prior criminal activity, (f)(1); that the murder was committed while the defendant was under the influence of a mental or emotional disturbance, (f)(2); that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired (f)(6); and that the defendant was seventeen years old at the time of the offense, (f)(7). The jury also found the catchall circumstance and seven nonstatutory mitigating circumstances. The jury found as an aggravating circumstance that the murder was especially heinous, atrocious, or cruel, (e)(9). Noting also that the codefendants had not received the death penalty and that the defendant's degree of culpability was contested in the evidence, we held Stokes' death sentence to be disproportionate. *Stokes*, 319 N.C. 1, 352 S.E.2d 653. In the case at bar, as in *Stokes*, defendant was found to have been under the influence of a mental or emotional disturbance. Also, as will be discussed below, defendant in the case at bar has a diminished IQ. However, unlike the defendant in *Stokes*, defendant here was convicted on the theory of premeditation and deliberation in addition to felony murder; the jury did not find that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired; and defendant, who was approximately thirty-six years old at the time of the offense, had a significant history of prior violent felonies and killed the victim in her home rather than at a place of employment.

In *Young*, 312 N.C. 669, 325 S.E.2d 181, the defendant and two others who had been drinking all evening went to the victim's home for the ostensible purpose of purchasing liquor. Once inside, however, the defendant stabbed the victim, then instructed one of the others to "finish [the victim]." The defendant and the others then stole valuables from the victim's home. The defendant was convicted of first-degree murder, apparently on the theory of premeditation and deliberation. The jury found as aggravating circumstances that the murder was committed during the commission of a robbery or burglary, (e)(5), and that it was committed for pecuniary gain, (e)(6). The mitigating circumstances submitted were the defendant's age of nineteen and the catchall mitigating circumstance. The jury found one or more unspecified mitigating circumstances, but found them insuffi-

cient to outweigh the aggravating circumstances, and recommended a sentence of death. After reviewing similar cases, we concluded that Young's behavior was not as egregious as that of other defendants who had received the death penalty and held that the death sentence was disproportionate.

We have also examined the remaining cases cited above where the death penalty was determined to be disproportionate and have determined that none are substantially similar to the case at bar. As part of our review, we also compare the instant case with cases where the death penalty has been found proportionate. *McCollum*, 334 N.C. 208, 433 S.E.2d 144. Although we consider all the cases in the pool of similar cases, we are not required to cite all those cases every time we undertake this responsibility. *State v. Peterson*, 350 N.C. 518, 516 S.E.2d 131 (1999), *cert. denied*, 528 U.S. 1164, 145 L. Ed. 2d 1087 (2000). Nevertheless, several recent robbery-murder cases are pertinent, as discussed below.

In *State v. Meyer*, 353 N.C. 92, 540 S.E.2d 1 (2000), the defendant and another broke into the home of an elderly couple. The defendant stabbed each victim fatally, while his codefendant also stabbed one of the victims. The defendant pled guilty to both murders (the theory of each murder was not specified). At the defendant's sentencing hearing, the jury found the following aggravating circumstances as to each victim: the murder was committed during the course of a robbery, (e)(5); the murder was committed during the course of a burglary, (e)(5); the murder was especially heinous, atrocious, or cruel, (e)(9); and the murder was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person, (e)(11). The only mitigating circumstance found by the jury was that the defendant had no significant criminal history, (f)(1). In our opinion, we observed that among the statutory aggravating circumstances, (e)(3) (prior history of violent felonies), (e)(5) (capital felony committed while defendant was in commission of burglary, among other offenses), (e)(9) (capital felony was especially heinous, atrocious, or cruel), and (e)(11) (course of conduct) have been held sufficient to support a death sentence even when standing alone. *Id.* at 120, 540 S.E.2d at 18 (citing *State v. Bacon*, 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995)). We also noted that the victims were killed in their home. We concluded that the death sentences were not disproportionate.

In *State v. Roseboro*, 351 N.C. 536, 528 S.E.2d 1, *cert. denied*, 531 U.S. 1019, 148 L. Ed. 2d 498 (2000), the defendant was convicted of first-degree murder based on theories of premeditation and deliberation and of felony murder. He was also convicted of first-degree rape, first-degree burglary, felony larceny, and possession of stolen property. A codefendant initially broke into the victim's home. He was joined later by the defendant, who suffocated the victim and raped her as she lay dying or shortly after death. The defendant presented evidence that he had borderline intelligence and suffered from personality disorder and chronic substance dependence disorder. The jury found as aggravating circumstances that the murder was committed during the commission of a burglary, (e)(5), and that the murder was committed during the commission of a rape, (e)(5). The jury found as mitigating circumstances that the defendant's capacity to appreciate the criminality of his conduct and to conform to the requirements of the law was impaired, (f)(6), and that the defendant aided in the apprehension of another capital felon, (f)(8). We concluded that the death sentence was proportionate.

In *State v. Thomas*, 350 N.C. 315, 514 S.E.2d 486, *cert. denied*, 528 U.S. 1006, 145 L. Ed. 2d 388 (1999), the defendant broke into the victim's home. After binding and gagging the victim, the defendant stabbed him thirty-six times, then stole the victim's wallet, clothing, and automobile. The defendant was convicted of first-degree murder based on premeditation and deliberation and on felony murder. The jury found as aggravating circumstances that the defendant had a history of prior violent felonies, (e)(3); that the murder occurred during the commission of a burglary, (e)(5); and that the murder was especially heinous, atrocious, or cruel, (e)(9). The jury found four unspecified mitigating circumstances. In our proportionality review, we observed that we had found no death sentence disproportionate where the (e)(3) aggravating circumstance had been found. We also noted that a finding of first-degree murder based on theories of premeditation and deliberation and of felony murder is significant. *Id.* at 365, 514 S.E.2d at 517; *accord State v. Harris*, 338 N.C. 129, 161, 449 S.E.2d 371, 387 (1994) (a finding of premeditation and deliberation evinces " 'a more calculated and cold-blooded crime' ") (quoting *Lee*, 355 N.C. at 297, 439 S.E.2d at 575), *cert. denied*, 514 U.S. 1100, 131 L. Ed. 2d 752 (1995). We concluded that the death penalty was proportionate.

In *State v. Barnes*, 345 N.C. 184, 481 S.E.2d 44, *cert. denied*, 522 U.S. 876, 139 L. Ed. 2d 134 (1997), *and cert. denied*, 523 U.S. 1024, 140

L. Ed. 2d 473 (1998), a codefendant who needed money enlisted two others into a robbery scheme. (The appeals of the three codefendants were all addressed in this case.) The three broke into the victims' home; shot the two victims fatally; then stole money, jewelry, and firearms. The defendants used the proceeds of the crime to purchase drugs. All three defendants were found guilty of first-degree murder based on premeditation and deliberation and on felony murder. After a capital sentencing proceeding, the jury recommended life for one codefendant and death for the other two. For purposes of this analysis, we focus on the defendants who received death sentences. The jury found the same aggravating circumstances for each defendant: each had a prior record of violent felonies, (e)(3); the murders were committed for pecuniary gain, (e)(6); the murders were especially heinous, atrocious, or cruel, (e)(9); and the murders were part of a course of conduct that included the commission by the defendant of other crimes of violence against another person, (e)(11). The jury found ten mitigating circumstances as to one defendant and no mitigating circumstances as to the other defendant. We concluded that the death sentence for each defendant was not disproportionate.

In *State v. Adams*, 347 N.C. 48, 490 S.E.2d 220 (1997), *cert. denied*, 522 U.S. 1096, 139 L. Ed. 2d 878 (1998), the defendant broke into the home of the seventy-year-old female victim to steal money for a marijuana purchase. When the victim awoke, the defendant fatally stabbed her and fled, taking $38.00. Shortly thereafter, the defendant turned himself in and confessed. Evidence was presented to show that the defendant had a borderline personality with dependent and histrionic traits and was marijuana-dependent. He was convicted of first-degree murder on the basis of premeditation and deliberation and of felony murder. The jury found as aggravating circumstances that the murder was committed to effect the defendant's escape, (e)(4); that the murder was committed in commission of an armed robbery, (e)(5); and that the murder was especially heinous, atrocious, or cruel, (e)(9). The opinion does not state what, if any, mitigating circumstances were found, but we did note that there was no evidence that the defendant was unable to appreciate the criminality of his conduct. We concluded that the death penalty was not disproportionate.

Finally, in *State v. Chandler*, 342 N.C. 742, 467 S.E.2d 636, *cert. denied*, 519 U.S. 875, 136 L. Ed. 2d 133 (1996), the defendant, who apparently was looking for marijuana, cut a door screen to gain access to the victim's house. While inside, he killed the victim, a

ninety-year-old widow, by means of a massive blow to the head. The defendant was convicted of first-degree murder on the basis of felony murder, with first-degree burglary as the underlying felony. The sole aggravating circumstance found by the jury was that the murder was committed for pecuniary gain, (e)(6). The jury rejected the defendant's proposed mitigating circumstance that the defendant suffered from an impaired capacity to appreciate the criminality of his conduct, (f)(6). In conducting our proportionality review, we noted the defendant did not seek medical help for the victim. In addition, the defendant's efforts to fabricate an alibi showed a lack of remorse. We also observed that the murder took place in the victim's home and stated that such a killing particulary shocks the conscience because it constitutes a violation of " 'an especially private place, one in which a person has a right to be secure.' " *Id.* at 763, 467 S.E.2d at 648 (quoting *State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987)). We concluded that the death sentence was not disproportionate.

Based on these and other similar cases in the pool, we discern the following salient factors pertaining to defendant here: (1) defendant was convicted on the theory of premeditation and deliberation and the theory of felony murder, *see State v. Thomas*, 350 N.C. 315, 514 S.E.2d 486; (2) defendant murdered the elderly victim in her home, *see State v. Meyer*, 353 N.C. 92, 540 S.E.2d 1; *State v. Chandler*, 342 N.C. 742, 467 S.E.2d 636; (3) the jury found defendant had a history of violent felony convictions,(e)(3), and no death sentence has been disproportionate where this circumstance has been found, *see State v. Thomas*, 350 N.C. 315, 514 S.E.2d 486; (4) the jury found aggravating circumstances pursuant to both (e)(3) and (e)(5), each of which is alone sufficient to support a death sentence, *see State v. Meyer*, 353 N.C. 92, 540 S.E.2d 1; (5) defendant took no steps to seek help for the victim, *see State v. Chandler*, 342 N.C. 742, 467 S.E.2d 636; (6) defendant was an adult, *compare State v. Robinson*, 342 N.C. 74, 463 S.E.2d 218 (1995) (defendant age twenty-one), *cert. denied*, 517 U.S. 1197, 134 L. Ed. 2d 793 (1996) *with Stokes*, 319 N.C. 1, 352 S.E.2d 653 (defendant age seventeen); and (7) defendant's actions in Ms. McCracken's apartment were consistent with a deliberate killing, *cf. State v. Benson*, 323 N.C. 318, 372 S.E.2d 517. These factors all indicate that defendant's death sentence is not disproportionate.

In addition, we feel compelled to address defendant's mental and intellectual status. Defendant presented the testimony of Claudia Coleman, Ph.D., who was qualified and recognized by the court as an

expert in clinical psychology, neuropsychology, and forensic psy-
chology. During the guilt-innocence portion of the proceedings,
defendant offered Dr. Coleman's testimony for the purpose of casting
doubt on the credibility of his confession to Detective Saul. In a *voir
dire* conducted in the absence of the jury, Dr. Coleman described the
various tests she had administered to defendant, including tests for
intelligence and screening for neurological difficulties. The intelli-
gence test yielded an overall verbal IQ of 68, a performance score of
63, and a full-scale IQ of 63. Other tests showed defendant's reading,
spelling, and arithmetic scores were significantly below average for
his age, but his memory was within normal limits. Dr. Coleman testi-
fied during *voir dire* that defendant demonstrated symptoms of
schizophrenic process, along with a history of alcohol and drug
dependence. When asked her opinion of defendant's intelligence, Dr.
Coleman responded:

> [I]t is my opinion that he has not historically functioned within
> the . . . true range of mental retardation. I believe that he's
> probably functioned in the borderline range. . . . [I]t's still
> significantly below normal or average, but above actual retarda-
> tion. . . . I believe that some of the time[d] test[s] on the intelli-
> gence testing were biased to a certain degree because of his
> psychomotor slowness. Now, I have to qualify my own opinion.
> Again, it may be that because he has had the head injuries [which
> defendant self-reported to Dr. Coleman] that he has functioned in
> that range. But I don't have information that he's functioned quite
> that low. It appears that he's functioned a little bit higher than
> retardation.

She went on to clarify that because the antipsychotic and tran-
quilizing drugs being taken by defendant could have the side effect of
slowing his thinking and performance, her opinion that defendant's
intelligence category was borderline rather than retarded took into
account the effect of these prescribed drugs on his test scores.

After *voir dire* was completed, Dr. Coleman testified before the
jury. Her testimony concerning defendant's intelligence was that

> he was functioning within the mild range of mental retardation
> on the testing across the board for both verbal and performance
> I.Q. scores. And it resulted in an overall I.Q. score within the
> range of mild mental retardation. . . . [T]hat score was . . . the full
> scale at 63. . . . [A]gain, I . . . think that the performance test was

influenced somewhat by some medication he was on, and it's probably a little higher than that.

She summed up her testimony in the guilt-innocence phase by stating:

First of all, [defendant], in my opinion, has the symptoms, and has had them for quite a while, of a schizophrenic process, . . . specifically what is characterized as undifferentiated schizophrenia. Schizophrenia is a very serious major mental illness that involves a person, disturbance and disorganization in a person's thinking, behavior, mood. . . . [I]t is also my opinion with regard to the available information that he has a serious, very serious, long history of substance dependence. The substances being primarily alcohol, marihuana, cocaine, and at one time heroin. . . . [I]t is my impression that [defendant's] performance I.Q. is down, the one I got from him, because of medication side effects that he takes for his psychotic symptoms. He's on an antipsychotic medication, and has been on it for some time. Those types of medications tend to slow a person down. It slows their thinking and kind of behaviorally slows them. And because of that, we often on— particularly on motor or times tasks get some deficits that if an individual weren't on the medication, we wouldn't find. In other words, it would be a little higher.

Now, on the verbal I.Q. testing his score within the mentally retarded range should not have been affected significantly by the medication. But historically he has functioned, in my opinion, more in the borderline range. Which, if you look at average functioning, what you've got is superior, high average, average, low average. And this holds for I.Q. or social functioning. Borderline and then retarded. . . . [I] think that he has certainly functioned intellectually and socially and adaptively in the borderline range, which is, again, below average. And significantly below average but probably within the range of retardation. I cannot be sure of that unless we were able to administer the tests when he was mentally stable and not on medication.[2]

After the jury returned a verdict of guilty, defendant recalled Dr. Coleman at the sentencing phase. She again testified that defendant exhibited borderline mental functioning with verbal functioning in

_____

2. We note that the penultimate sentence in this portion of Dr. Coleman's testimony appears inconsistent with the rest of her testimony. Because she elsewhere testified several times that she believed defendant fell in the borderline range, we assume either that she misspoke here or that a transcription error occurred.

the mildly retarded range. As noted above, at least one juror found as a mitigating circumstance pertinent to the instant analysis that defendant was under the influence of a mental or emotional disturbance at the time of the offense, that defendant suffered from a mental condition insufficient to constitute a defense but which significantly reduced defendant's culpability, and that defendant was under the influence of cocaine at the time of the offense. However, no juror found "the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired" or "defendant's limited mental capacity at the time of the commission of the offense significantly reduced defendant's culpability for the offense," even though these factors were submitted to the jury.

It appears the jury heeded Dr. Coleman's testimony. Her opinions that defendant was suffering from schizophrenic process and that his intellectual status was borderline rather than retarded are reflected in the jury's findings of, and failure to find, the corresponding mitigating circumstances. Because defendant's own expert provided opinion testimony that he was not retarded, and because the jurors, who heard defendant and the expert, found he was not retarded, we conclude that our earlier decisions addressing retarded capital defendants are only marginally pertinent. *See, e.g., State v. Holden,* 346 N.C. 404, 488 S.E.2d 514 (1997), *cert. denied,* 522 U.S. 1126, 140 L. Ed. 2d 132 (1998); *State v. Skipper,* 337 N.C. 1, 446 S.E.2d 252 (1994), *cert. denied,* 513 U.S. 1134, 130 L. Ed. 2d 895 (1995); *McCollum,* 334 N.C. 208, 433 S.E.2d 144. The fact that defendant's IQ fell in the borderline range does not affect our conclusion, after reviewing the record in its entirety, that the sentence of death was not disproportionate.

Nevertheless, we are aware that defendant's IQ raw score falls into the retarded range and that Governor Michael F. Easley has signed legislation that provides that a mentally retarded defendant shall not be sentenced to death. Act of Aug. 4, 2001, ch. 346, sec. 1, 2001 N.C. Sess. Laws (adding N.C.G.S. § 15A-2005 effective 1 October 2001 for trials docketed to begin on or after that date). This legislation includes a provision applicable to defendants who may be mentally retarded but have already been sentenced to death. Ch. 346, sec. 3, 2001 N.C. Sess. Laws (adding N.C.G.S. § 15A-2006 effective 1 October 2001). At the time of defendant's trial, his counsel had no reason to anticipate that defendant's IQ would have the significance that it has now assumed. Accordingly, we additionally hold that our

ruling today as to other issues in defendant's trial shall not prejudice any right of defendant to seek post-conviction relief pursuant to this new legislation.

Based upon the foregoing, we conclude that defendant received a fair trial, free of prejudicial error.

NO ERROR.