STATE OF NORTH CAROLINA v. CAROLYN NANCE

No. COA01-353

(Filed 16 April 2002)

**Search and Seizure— warrantless seizure—neglected horses**

The trial court erred in a prosecution for misdemeanor cruelty to animals by denying defendant's motion to suppress evidence seized without a warrant where animal control officers responding to a telephone call viewed defendant's horses from a road and driveway beside the pasture leased by defendant; the horses were in open areas and were not in barns or closed structures; the horses were emaciated, standing in water and mud, and were without visible food; the officers left to make arrangements for transportation and care of the horses; and they returned 3 days later and seized the horses without a warrant. Knowledge

---

STATE v. NANCE

[149 N.C. App. 734 (2002)]

that officers gain from plain-view observations does not constitute a search under the Fourth Amendment, but whether such observations can justify a warrantless seizure is a separate question. Here, there were no exigent circumstances and there was ample time to secure a warrant during the 3 days in which arrangements were made for the transportation and care of the horses. However, information (such as photographs) gathered before officers entered the property would be admissible.

Appeal by defendant from judgments entered 20 September 2000 by Judge Sanford L. Steelman, Jr., in Rowan County Superior Court. Heard in the Court of Appeals 31 January 2002.

*Attorney General Roy Cooper, by Assistant Attorney General Joan M. Cunningham, for the State.*

*Noell P. Tin for defendant appellant.*

TIMMONS-GOODSON, Judge.

On 20 September 2000, a jury found Carolyn Nance ("defendant") guilty of six counts of misdemeanor cruelty to an animal. Before trial, defendant made a motion to suppress evidence seized by animal control officers without a warrant. Specifically, defendant objected to the officers' seizure of six horses owned by defendant. Defendant's motion to suppress came before the trial court on 18 September 2000, at which time the trial court made the following pertinent findings of fact:

5. On December 18, 1998, Animal Control Officers received a telephone call . . . concerning the welfare of a herd of horses located off Old Mocksville Road in Rowan County.

6. Rowan County Animal Control Officers Frances Pepper and Animal Control Field Supervisor Robin Cook went to the Ridenhour farm located on Old Mocksville Road in Rowan County where they were met by the owner of the farm, John Ridenhour. Through investigation they learned that the horses were owned by the Defendant and that she leased barns and paddocks from Mr. Ridenhour. The Officers initially viewed the horses from the road beside the pasture. They saw horses that were extremely thin, had their bones showing, were in an emaciated condition, and appeared to be starving. They were standing in water and mud without any visible food. Some of the horses

were visible from the common driveway shared by the Kirkpatrick septic business, the Ridenhour home and the Defendant Nance's leased property. None of the horses were in closed structures, barns, behind closed doors or otherwise out of sight. The horses were located in open, accessible areas on the Defendant's leased property. The horses, and their condition were readily visible to the officers from the roadway that ran back to the septic tank business. The officers saw around 18 horses on the property that night.

7. Officers were unable to seize the horses on December 18, 1998, due to having no transportation for the horses and having no facilities for their care.

8. Animal Control Supervisor Clai Martin was advised of the situation by Officer Cook and went to the Ridenhour farm on Saturday morning, December 19, 1998. He spent only 5 minutes but in that time he saw that the horses he was able to see from the roadway that ran back to the septic tank business were in extremely poor condition, they were very thin and appeared to be starving. He . . . did not see any food for these horses.

9. Officers Martin and Cook began making arrangements for seizing some of these horses. The arrangements included getting an agreement from Rowan County and the Jaycees to allow the seized horses to be kept at the Rowan County Fairgrounds, which had inside accommodations for horses, getting transportation in the form of stock trailers for the horses and getting people who were familiar with horses to assist in the loading and unloading of the horses. The plan was to meet at the Ridenhour farm at 8:30am on Monday December 21, 1998, and to remove 9 of the horses in the worst condition, if the condition of the horses and the property was the same as seen by Officers on December 18 and 19, 1998.

10. On December 21, 1998, Animal Control Officers for Rowan County including Field Supervisor Cook and Officer Frances Pepper, Salisbury Animal Control Officer Ann Frye, Animal Control employee Kim Moore and other volunteers went to the Ridenhour farm. The horses were still located in open accessible areas on the Defendant Nance's leased property. None of the horses were located in any enclosed structure. The horses were emaciated and appeared to be starving . . . . The Animal Control Officers concluded, based upon their training and experience that

the horses were starving and in need of immediate veterinary treatment. There was no available food for these horses and Supervisor Martin was called and made the final decision to seize the horses.

. . . .

12. The Defendant came to the Ridenhour farm on December 21, 1998, and ordered Officers and others off her leased property and ordered the officers to unload her horses. The Defendant did not consent to the officers' presence or the taking of the horses.

13. The 6 horses that are involved in these cases were seized that day. The horses were in plain view and were evidence that they had been cruelly treated under G.S. 14-360. Exigent circumstance[s] existed in that if the horses were not fed and did not receive immediate veterinary treatment they might further deteriorate or even die.

14. There was no search warrant or other process obtained by the officers before their seizure of the horses on December 21, 1998. The officers did not obtain an Order under G.S. 19A-46.

. . . .

16. The Fourth Amendment protects people in their homes and the curtilage of their homes, but not within open areas outside of the curtilage of their homes. The defendant admitted living at least 1 mile from the Ridenhour farm and that there were at least 2 landowners between her personal residence and her leased property at the Ridenhour farm. The horses were not kept within the curtilage of Defendant's property.

17. The horses that are the subject of these cases were being kept in open paddocks that were surrounded by open pipe fencing; the horses were visible to anyone outside of the fence. None of the horses was kept in a closed structure or in an enclosed barn behind any type of door.

Based on the above-stated facts, the trial court concluded that, because "[t]he rental property where the horses were located was not covered by the Fourth Amendment[,]" the warrantless entry onto defendant's property and seizure of her horses did not violate defendant's constitutional or statutory rights. The trial court therefore denied defendant's motion to suppress.

Upon receiving the jury's guilty verdict, the trial court sentenced defendant to a suspended sentence of forty-five days' imprisonment and placed defendant on supervised probation for eighteen months. Defendant also forfeited the six horses to the Rowan County Animal Control, and the trial court ordered her "not to own, possess, or care for any animals while on probation." The trial court further ordered defendant to pay fines, costs and restitution to Rowan County for the care of the horses. Defendant appeals from her conviction and resulting sentence.

---

The issue on appeal is whether the trial court erred in denying defendant's motion to suppress the evidence seized by animal control officers without a warrant. For the reasons stated herein, we reverse the trial court.

The trial court's findings of fact following a suppression hearing are conclusive and binding on the appellate courts when supported by competent evidence. *See State v. Brooks*, 337 N.C. 132, 140-41, 446 S.E.2d 579, 585 (1994). While the trial court's factual findings are binding if sustained by the evidence, the court's conclusions based thereon are reviewable *de novo* on appeal. *See State v. Mahaley*, 332 N.C. 583, 592-93, 423 S.E.2d 58, 64 (1992), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 649 (1995).

Defendant argues that the animal control officers had no right to enter her property and seize her horses without first securing a warrant. Such seizure, contends defendant, was *per se* unreasonable under the Fourth Amendment, and as such, the evidence obtained by the illegal seizure was inadmissible at trial. The State argues that, as the horses were located in plain view in an open field, their seizure did not implicate defendant's Fourth Amendment rights. Under the facts of the present case, we agree with defendant that the officers' entry onto her property and seizure of her horses violated her rights under the Fourth Amendment, and we therefore reverse the judgment of the trial court.

The Fourth Amendment provides, in pertinent part, that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113, 80 L. Ed. 2d 85, 94 (1984). A search occurs when there is an

infringement upon a person's expectation of privacy that society recognizes as reasonable. *See id.* "The right to security in person and property protected by the Fourth Amendment may be invaded in quite different ways by searches and seizures. A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person or property." *Horton v. California,* 496 U.S. 128, 133, 110 L. Ed. 2d 112, 120 (1990). Thus, whether an individual's privacy interest has been compromised is a distinct question requiring a separate analysis than the issue of whether an individual has been unreasonably deprived of dominion over his property. *See id.*

In the instant case, animal control officers seized horses that were located on defendant's property in an open field. Generally, an open field is not an area entitled to Fourth Amendment privacy protection, because an individual has no legitimate privacy interest in areas outside the home or its curtilage. *See United States v. Dunn,* 480 U.S. 294, 300, 94 L. Ed. 2d 326, 334 (1987); *State v. Tarantino,* 322 N.C. 386, 390, 368 S.E.2d 588, 591 (1988), *cert. denied,* 489 U.S. 1010, 103 L. Ed. 2d 180 (1989). "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States,* 389 U.S. 347, 351, 19 L. Ed. 2d 576, 582 (1967). Thus, when officers are in a public place or some other area, such as an open field, that is not protected by the Fourth Amendment, knowledge that they gain from their plain-view observations does not constitute a search under the Fourth Amendment. *See Payton v. New York,* 445 U.S. 573, 586-87, 63 L. Ed. 2d 639, 651 (1980). Whether such plain-view observations can justify a warrantless seizure, however, is a separate question. *See Soldal v. Cook County,* 506 U.S. 56, 65-66, 121 L. Ed. 2d 450, 461-62 (1992). "If the boundaries of the Fourth Amendment were defined exclusively by rights of privacy, 'plain view' seizures would not implicate that constitutional provision at all. Yet, far from being automatically upheld, 'plain view' seizures have been scrupulously subjected to Fourth Amendment inquiry." *Id.* at 66, 121 L. Ed. 2d at 461. "That is because, the absence of a privacy interest notwithstanding, '[a] seizure . . . obviously invade[s] the owner's possessory interest.' " *Id.* (quoting *Horton,* 496 U.S. at 134, 110 L. Ed. 2d at 121) (alteration in original). Thus, in the case at bar, although the observation by animal control officers of the horses located on defendant's property in an open field was not a search entailing defendant's privacy interests, there is no question that the officers deprived defendant of her possessory interest in her horses when they removed the horses from her

property. Such deprivation clearly constituted a seizure and therefore implicated Fourth Amendment protections. As defendant's Fourth Amendment rights were implicated by the seizure, the issue becomes whether or not such seizure was reasonable under the Fourth Amendment.

Whether or not the warrantless seizure of items in plain view is reasonable under the Fourth Amendment depends on several factors. First, officers must not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. *See Horton*, 496 U.S. at 136, 110 L. Ed. 2d at 123. Second, the incriminating character of the item in plain view must be "immediately apparent." *Coolidge v. New Hampshire*, 403 U.S. 443, 466, 29 L. Ed. 2d 564, 583 (1971). Third, "not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself." *Horton*, 496 U.S. at 137, 110 L. Ed. 2d at 123; *see also Soldal*, 506 U.S. at 66, 121 L. Ed. 2d at 461 (noting that, in the absence of consent, warrantless seizures "can be justified only if they meet the probable-cause standard . . . and if they are unaccompanied by unlawful trespass") (citation and footnote omitted); *State v. Worsley*, 336 N.C. 268, 282, 443 S.E.2d 68, 75 (1994) (affirming that seizure of suspicious items in plain view inside a dwelling is lawful only if the officer possesses the legal authority to be on the premises).

Applying the above-stated factors to the officers' actions in the instant case, we first conclude that the officers did not violate the Fourth Amendment when they initially viewed the horses. The trial court's findings reveal that the officers could clearly and plainly view the horses from the officers' vantage point from the adjacent Ridenhour property and the common roadway beside defendant's property. The horses were not within any type of enclosed structure and were surrounded only by open pipe and electrical fencing that was not designed to shield the animals from view. *See Dunn*, 480 U.S. at 303, 94 L. Ed. 2d at 336 (stating that fences intended to corral livestock are not designed to prevent people from observing what lies within the enclosed area).

Second, the incriminating character of the evidence seized in the instant case was immediately apparent to the animal control officers. North Carolina General Statutes section 14-360, entitled Cruelty to Animals, provides that:

STATE v. NANCE

[149 N.C. App. 734 (2002)]

(a) If any person shall intentionally overdrive, overload, wound, injure, torment, kill, or deprive of necessary sustenance, or cause or procure to be overdriven, overloaded, wounded, injured, tormented, killed, or deprived of necessary sustenance, any animal, every such offender shall for every such offense be guilty of a Class 1 misdemeanor.

N.C. Gen. Stat. § 14-360(a) (1999). The trial court found, and the record shows, that the horses were extremely thin and in an emaciated condition when the officers observed them. The horses' bones were showing, and they appeared to be starving. Further, the animals were standing in water and mud without any visible food. These findings by the trial court, as well as photographs of the animals included in the record, indicate that the condition of the horses was piteous to a degree open and obvious to anyone viewing them, such that the officers could reasonably conclude that section 14-360 had been violated. The incriminating character of the evidence seized was therefore immediately apparent.

In the third and final prong of the test for determining whether the warrantless seizure was reasonable, we must examine whether the officers had lawful access to the horses when they seized the animals. The United States Supreme Court has explained that the requirement of lawful access to the object seized

is simply a corollary of the familiar principle . . . that no amount of probable cause can justify a warrantless search or seizure absent "exigent circumstances." Incontrovertible testimony of the senses that an incriminating object is on premises belonging to a criminal suspect may establish the fullest possible measure of probable cause. But even where the object is contraband, this Court has repeatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure.

*Coolidge*, 403 U.S. at 468, 29 L. Ed. 2d at 584; *see Horton*, 496 U.S. at 137 n.6b, 110 L. Ed. 2d at 123 n.7. The officers in the instant case had neither consent nor a warrant authorizing their entry onto defendant's property. The State argues that the officers' access to the animals was lawful on several grounds. First, the State argues that the horses were located in a public place. Second, the State asserts that "officers who are conducting a legitimate law enforcement function on property are not violating North Carolina's criminal trespass laws" and that therefore, the access was lawful. Finally, the State contends

that exigent circumstances existed such that the officers were not required to obtain a warrant. We disagree on all points.

First, although it is true that "objects such as weapons or contraband found in a public place may be seized by the police without a warrant[,]" there is no evidence whatsoever that defendant's leased property was "a public place." *Payton*, 445 U.S. at 587, 63 L. Ed. 2d at 651. The fact that defendant's property included open fields does not transform private property into public land. We therefore reject this basis as a justification for the officers' actions.

We further disagree with the State's assertion that law enforcement officers may enter private property whenever they are conducting "legitimate law enforcement functions." The State relies on two cases for its assertion, namely *State v. Tripp*, 52 N.C. App. 244, 278 S.E.2d 592 (1981), and *State v. Prevette*, 43 N.C. App. 450, 259 S.E.2d 595 (1979), *appeal dismissed and disc. review denied*, 299 N.C. 124, 261 S.E.2d 925, *cert. denied*, 447 U.S. 906, 64 L. Ed. 2d 855 (1980). Neither case stands for the proposition that law enforcement officers may enter private property without a warrant and seize evidence of a crime. Rather, both cases affirm that "[l]aw enforcement officers have the right to approach a person's residence to inquire as to whether the person is willing to answer questions[,]" *Tripp*, 52 N.C. App. at 249, 278 S.E.2d at 596, and do not trespass when they enter an individual's property "for the purpose of a general inquiry or interview." *Prevette*, 43 N.C. App. at 455, 259 S.E.2d at 599-600. Thus, officers standing on the porch of the defendant's residence in *Prevette* were lawfully on the premises when they observed in plain view marijuana inside the defendant's home. The *Prevette* Court warned, however, that "plain view of objects inside a house will furnish probable cause but will not, without exigent circumstances, authorize entry to seize without a warrant." *Id.* at 456, 259 S.E.2d at 600.

The officers in the instant case did not enter defendant's property in order to conduct a "general inquiry or interview;" rather, they entered defendant's property for the express purpose of seizing evidence of a crime. Although the trial court found that the horses were located in "accessible" areas, the evidence does not support this finding. The transcript reveals that the animal control officers were forced to remove the electrical fencing surrounding the horses in order to gain access to the animals. If the position advanced by the State were correct, law enforcement officers could enter onto private property and seize evidence of criminal activity without a warrant

whenever they had probable cause to suspect that such activity was taking place. Such a position directly contradicts repeated admonitions by the United States Supreme Court that although

> "[t]he seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity[,]" [a] different situation is presented . . . when the property in open view is "situated on private premises to which access is not otherwise available for the seizing officer."

*Texas v. Brown*, 460 U.S. 730, 738, 75 L. Ed. 2d 502, 511 (1983) (quoting *Payton*, 445 U.S. at 587, 63 L. Ed. 2d at 651). As this Court has observed, "[t]he implication that police officers have the right to seize any item which comes into their plain view at a place they have a right to be is fraught with danger and would sanction the very intrusions into the lives of private citizens against which the Fourth Amendment was intended to protect." *State v. Bembery*, 33 N.C. App. 31, 33, 234 S.E.2d 33, 35, *disc. review denied*, 293 N.C. 160, 286 S.E.2d 704 (1977).

The State further argues that the officers' access to the horses was lawful because exigent circumstances existed to justify the warrantless seizure. Exigent circumstances exist when there is "[a] situation that demands unusual or immediate action and that may allow people to circumvent usual procedures[.]" *Black's Law Dictionary* 236 (7th ed. 1999); *see also* Robert L. Farb, *Arrest, Search, and Investigation in North Carolina* 49 (2d ed. 1992) (stating that exigent circumstances exist when immediate action is necessary). "If the circumstances of a particular case render impracticable a delay to obtain a warrant, a warrantless search on probable cause is permissible . . . ." *State v. Allison*, 298 N.C. 135, 141, 257 S.E.2d 417, 421 (1979). The United States Supreme Court has approved the following exigent circumstances justifying warrantless searches and seizures: (1) where law enforcement officers are in "hot pursuit" of a suspect, *see, e.g., State v. Santana*, 427 U.S. 38, 42-43, 49 L. Ed. 2d 300, 305 (1976); (2) where there is immediate and present danger to the public or to law enforcement officers, *see, e.g., Warden v. Hayden*, 387 U.S. 294, 298-99, 18 L. Ed. 2d 782, 787 (1967); (3) where destruction of evidence is imminent, *see, e.g., Santana*, 427 U.S. at 43, 49 L. Ed. 2d at 305; and (4) where the gravity of the offense for which the suspect is arrested is high, *see, e.g., Welsh v. Wisconsin*, 466 U.S. 740, 753, 80 L. Ed. 2d 732, 745 (1984). These cases suggest that exigent circumstances exist

where the need for immediate action is so great as to outweigh the potential infringement of a defendant's rights under the Fourth Amendment, thereby justifying the officers' failure to obtain a warrant.

In the present case, the trial court stated that "[e]xigent circumstance[s] existed in that if the horses were not fed and did not receive immediate veterinary treatment they might further deteriorate or even die." The trial court's findings of fact, however, do not support its conclusion that exigent circumstances existed. The evidence and the trial court's own findings reveal that the animal control officers first viewed the horses and their condition on 18 December 1998, but "were unable to seize the horses [at that time] due to having no transportation for the horses and having no facilities for their care." During the next two days, the officers "began making arrangements for seizing some of these horses." Such arrangements included "getting an agreement from Rowan County and the Jaycees to allow the seized horses to be kept at the Rowan County Fairgrounds," obtaining "transportation in the form of stock trailers[,]" and finding "people who were familiar with horses to assist in the loading and unloading of the horses." During all of this time, however, no one secured a warrant authorizing entry onto defendant's property and seizure of the horses. The officers did not actually seize the horses until 21 December 1998, three days after initially viewing their condition.

We conclude that exigent circumstances did not exist in the instant case. Clearly, obtaining a warrant would not have presented an impracticable delay under the circumstances. Although the trial court found that the horses might further deteriorate or even die if they did not receive immediate treatment, we note that the horses did not actually receive such treatment until 21 December 1998, when they were seized. The record shows that animal control officers had ample time during the three days after viewing the horses in which to secure a warrant, but neglected to do so because they mistakenly believed it to be unnecessary. As Animal Control Department Supervisor Clai Martin explained, "it was an open field, and we went by the open field and that field was away from the curtilage of the property, and, of course, in that situation no warrant is required." Because exigent circumstances did not exist, the animal control officers did not have lawful access to the horses. The officers' entry onto defendant's property and the seizure of her horses was therefore an unreasonable seizure under the Fourth Amendment.

As the seizure of the horses violated defendant's Fourth Amendment rights, the trial court erred in denying defendant's motion to suppress evidence obtained pursuant to the illegal seizure. *See* N.C. Gen. Stat. § 15A-974 (1999) (requiring exclusion of unlawfully obtained evidence). We emphasize, however, that the animal control officers did not conduct an illegal search when they viewed the animals while standing on the adjacent property and roadway. Thus, any evidence gathered by the officers before they unlawfully entered defendant's property, including photographs of the horses, is not subject to defendant's motion to suppress.

This Court is sympathetic to the laudable efforts of animal control officers in North Carolina in preventing cruelty to animals, and in caring for and rehabilitating animals who have been neglected and abused. We are moreover mindful of the time, resource, and personnel constraints faced by such officers. "We believe, however, that the interests of all can be accommodated . . . while still respecting the integrity of the [F]ourth [A]mendment." *State v. Schwegler*, 170 Wis. 2d 487, 501, 490 N.W.2d 292, 297 (1992). In conclusion, we hold that the trial court erred in denying defendant's motion to suppress evidence admitted at trial as a result of a warrantless seizure. We therefore reverse the judgment of the trial court and remand for a new trial.

Reversed and remanded.

Judges BRYANT and SMITH concur.