STATE OF NORTH CAROLINA v. BRIAN JACKIE HARPER, Defendant

No. COA02-764

(Filed 1 July 2003)

**1. Search and Seizure— permission to enter hotel room— nonverbal conduct**

A cocaine defendant's nonverbal conduct in a doorway (stepping back and opening the door) constituted a valid consent for officers to enter the hotel room. Defendant did not contend that he lacked authority to consent or that his consent was obtained through duress or coercion.

**2. Search and Seizure— plain view doctrine—scales seen in hotel room**

Scales were lawfully observed and seized from a cocaine defendant under the plain view doctrine in the totality of the circumstances. A detective had received information that the occupants of a hotel room possessed drugs, the behavior of the occupants of the room indicated drug activity, and the detective saw the scales in the room after he knocked on the door, talked with defendant, and gained entry through a voluntary consent.

**3. Search and Seizure— warrantless—scene frozen awaiting warrant—exigent circumstances**

Officers were justified in lifting a mattress and in opening a nightstand drawer in a hotel room prior to obtaining a search warrant. Under the totality of the circumstances, the officers had probable cause to believe that a drug crime was being committed and they were justified in freezing the scene pending issuance of a search warrant. Their warrantless search of the area toward which defendant repeatedly moved was justified under the exigent circumstances exception.

Appeal by defendant from judgment entered 6 December 2001 by Judge Jack W. Jenkins in New Hanover County Superior Court. Heard in the Court of Appeals 25 March 2003.

*Attorney General Roy Cooper, by Assistant Attorney General Newton G. Pritchett, Jr., for the State.*

*William D. Spence for defendant appellant.*

ELMORE, Judge.

Defendant, Brian Jackie Harper, was indicted on 9 April 2001 for the following related offenses: trafficking in cocaine by possession (01 CRS 4678); possession with intent to sell and deliver cocaine (01 CRS 4679); conspiracy to traffic in cocaine (01 CRS 4680); possession with intent to sell and deliver heroin (01 CRS 4681); and maintaining a place for controlled substances and possession of drug paraphernalia (01 CRS 4682) (collectively, the "drug charges"). The drug charges arose out of events which occurred on 3 March 2001 at a Wilmington, North Carolina hotel while defendant was present and in control of a room therein. Prior to his indictments on the drug charges, defendant was indicted on 2 April 2001 for the unrelated offense of statutory rape (01 CRS 2530).

On 9 August 2001, defendant filed a motion to suppress certain evidence in his prosecution on the drug charges. This evidence consisted of (1) physical evidence seized, pursuant to a warrantless police search, on 3 March 2001 from a hotel room in which defendant was present, and (2) statements made by defendant during and after the search. On 6 December 2001, following a hearing and presentation of evidence by the State, the trial court denied defendant's motion to suppress. Immediately thereafter, pursuant to a plea arrangement made with the State in the event the motion to suppress was denied, defendant pled guilty to trafficking in cocaine by possession and assault on a female. Under the resulting plea agreement, the remaining drug charges and the statutory rape charge were dismissed, and defendant reserved the right to appeal the denial of his motion to suppress. The trial court sentenced defendant to a minimum of thirty-five months and a maximum of forty-two months imprisonment on the trafficking in cocaine by possession offense, and to 150 days, with full credit for time served, on the assault on a female offense.

On 10 December 2001, defendant gave notice of appeal to this Court from (1) the denial of his motion to suppress, and (2) the entry of final judgment after his guilty plea to the trafficking in cocaine by possession charge and the resulting prison sentence. For the reasons stated herein, we conclude that defendant's motion to suppress was properly denied, and we affirm the trial court's order and the final judgment entered pursuant to the plea agreement.

Evidence presented by the State at the suppression hearing tended to show that at approximately 11:00 a.m. on 3 March 2001,

Detective Charles Wilson (Detective Wilson) of the New Hanover County Sheriff's Department's Vice and Narcotics Unit was notified by a dispatcher of an anonymous call stating that "there was a large quantity of crack cocaine, heroin in Room 210 at the Homestay Inn at 245 Eastwood Road" in Wilmington. After unsuccessfully attempting to contact the tipster, Detective Wilson proceeded to the hotel, spoke with the desk clerk, and examined the log book, which contained an entry from the clerk who had been on duty the previous night stating "I think Room 210 is on drugs." Other entries indicated that the occupant of Room 210 paid cash for the room and "checked in as a single and then changed it to a double." According to the hotel registry, Room 210 was registered to "George Davis." Detective Wilson checked the vehicle registration information corresponding to Room 210 and determined that the license plate number matched a utility trailer registered to Nick Lionudakis of Escalon, California. Detective Wilson checked the parking lot and found no such trailer on the premises. Detective Wilson also learned from another hotel employee that within the past fifteen minutes, someone from Room 210 had "declined room service and requested that the maid come in . . . about an hour after they had left."

Detective Wilson, who was dressed in plain clothes and driving an unmarked car, called the Wilmington Police Department for backup and positioned his car in the parking lot where he could observe Room 210. He observed defendant, clad in a towel and brushing his teeth, step outside of Room 210 for a few seconds before re-entering the room. Soon thereafter, a blue car entered the lot and parked near Room 210. Detective Wilson watched as a man, later identified as Bryan Maurice Brailford (Brailford), got out of the car, knocked on the door to Room 210, and entered. After "a short period of time . . . maybe thirty to forty-five seconds," Brailford returned to the blue car and "leaned down and talked to the driver and the occupants of the car from the passenger side." Detective Wilson testified that he observed "some hand motions back and forth that led me to believe there was some kind of a transaction" between Brailford and the blue car's occupants, and that, based on his experience and training, this activity was consistent with a possible drug sale. Brailford then re-entered Room 210 and shut the door.

Within five minutes, Officer Bryan Robinson (Officer Robinson) of the Wilmington Police Department arrived in uniform and approached Detective Wilson's car. At the same time, Brailford opened the door to Room 210 and looked around. Fearing that

Brailford had spotted the uniformed Officer Robinson and that "if there was evidence of a drug crime in the room, it may be disposed of" as a result, Detective Wilson and Officer Robinson hurried across the parking lot towards Room 210. The blue car, which had remained in the parking lot, sped away.

Detective Wilson knocked on the door to Room 210. Defendant, now dressed, "opened the door slightly, a crack." Detective Wilson identified himself and asked to speak to George Davis. Defendant initially replied "George Davis doesn't stay here," but when Detective Wilson stated that the room was registered to George Davis, defendant "started stuttering a little bit" and said Davis had stepped out and he didn't know when Davis would be back. During this conversation, defendant had opened the door "a little bit more, probably about halfway open just for his body" and Detective Wilson could see Brailford in the room. Detective Wilson testified that "[defendant] was . . . blocking my access to the room" and he "could tell that [defendant] didn't want me to come into the room at that point . . . [b]y his body language." Detective Wilson then testified as follows:

A. I asked [defendant] if I could step inside the room—if I could step inside the room to see if George Davis was in, and at that moment, he stepped back from me, from the threshold of the door, opening up the door.

Q. How wide did he open the door?

A. He opened it almost to its full extension. It seemed plainly evident to me, in light of the question I just asked, "Can I step inside?" And immediately following, he stepped back from the threshold with his right hand, completely opens the door, virtually ushering myself and Officer Robinson inside the room, that he wanted us to come inside the room or he had given consent for us to come inside the room.

Q. Did he say anything?

A. No, sir. He just stepped back and kind of hung his head down.

Detective Wilson testified that as he was standing at the threshold he observed a set of electronic scales on the night stand between the room's two beds, and that he knew drug dealers often used such scales to measure quantities of illegal narcotics. Detective Wilson and Officer Robinson then entered the hotel room, where they observed

STATE v. HARPER

[158 N.C. App. 595 (2003)]

Brailford holding a cup and a lit cigarette. Defendant was initially cooperative, but Brailford became hostile when Detective Wilson asked him to put the cigarette and the cup down, so Detective Wilson took the items from him. Detective Wilson testified that he was concerned for his safety when Brailford "started moving about the room" and became increasingly "agitated," so he handcuffed Brailford and told him to sit on one of the beds. When Brailford refused to remain seated, Officer Robinson patted him down and was stuck in the hand by a hypodermic needle contained in Brailford's pocket.

Meanwhile, Detective Wilson continued to talk with defendant, who initially gave false information when asked for his name and date of birth. When asked by Detective Wilson, defendant refused to give his consent for the officers to search the hotel room. Detective Wilson then "froze" the room, meaning "nobody could leave or enter the room pending our application for a search warrant," and called for backup officers to initiate the search warrant application process. Because defendant defied the officers' order to remain seated on the other bed, he too was handcuffed.

When defendant and Brailford still refused to remain seated, Detective Wilson moved them into the kitchen and did a "quick frisk" of the "lunge area" near where defendant had been seated on the bed. This brief search consisted of lifting the mattresses of both beds, which were about two and one-half feet apart, opening a drawer in the night stand between the beds, and lifting the cushion of a chair next to one of the beds. Detective Wilson testified that he searched the "lunge area" near the beds and night stand because he was concerned "that [defendant] was trying to get to that area of the room to retrieve something . . . my feeling was he was going to get a weapon, maybe from under a mattress, maybe from inside the drawer." Detective Wilson discovered seven hundred dollars in cash under the mattress of the bed upon which Brailford had been seated, an additional quantity of cash under the chair cushion, and crack cocaine and an additional one hundred and fifty dollars in cash in the night stand drawer. The officers did not seize either the cash or drugs at that time, nor did they conduct any additional search of the hotel room until a search warrant had been issued. Shortly thereafter the officers received and executed the search warrant and discovered heroin behind the television and underneath a chest of drawers. At that point defendant and Brailford were placed under arrest.

Detective Wilson testified that he did not recall advising defendant of his *Miranda* rights and that he did not ask defendant anything

other than "general information" questions such as "name, date of birth, Social Security number, where he lives." The record does not indicate that defendant made any incriminating statements to Detective Wilson or Officer Robinson. Officer Robinson testified at the hearing and substantially corroborated Detective Wilson's testimony. Defendant offered no testimony on his behalf.

In denying defendant's motion to suppress, the trial court orally made findings of fact regarding the officers' entry into the hotel room as follows:

> Wilson knocked on the door. Robinson was . . . standing beside him. The Defendant opened the door slightly, a crack. Wilson identified himself as a detective, asked to speak with George Davis. The Defendant said there was no Davis there. Again, Wilson indicated that the room was registered in the room [sic] of George Davis. The Defendant said Davis had stepped out, didn't know if and when Davis was coming back. Wilson confronted the Defendant about this discrepancy. The door opened slightly more. Wilson could see in the room a little better. The Defendant blocked the door, still in a posture suggesting the Defendant did not want Wilson to enter the room. . . . Wilson asked if he could step into the room. It's unclear exactly what words were used at that time. The Defendant stepped back from the threshold of the door, the door opened to its full extension. The Defendant said nothing at this time. His hand was still on the doorknob, but his body had moved and the door had opened to the full extent.

> Wilson took this as a consent to enter and, at this time, Wilson saw scales in the room in plain view. Wilson stepped into the room. . . . The Defendant was cooperative and cordial.

Regarding the pre-warrant search of the hotel room, the trial court made the following findings of fact:

> At some point, the Defendant was handcuffed. Wilson asked the Defendant for consent to search the remainder of the premises. The Defendant said he could not give such consent because it was not his room.

> At this point, Wilson froze the room, contacted Detective Taft with [sic] a search warrant. The Defendant and the other male had appeared interested in a particular area of the room around the night stand between the beds. At some point, the Defendant

STATE v. HARPER

[158 N.C. App. 595 (2003)]

and the male were removed to the kitchen and away from that area. Wilson then checked or patted down, frisked the so-called lunge area. And in that area, also, the scales were seen in plain view, but also checked under the mattresses. Under one mattress, found money; under the other mattress, found nothing. In the drawer . . . between the two beds, found a Bible. Also found drugs and money.

At this point, the officers observed [sic] the status quo, did not move anything and were in wait of receipt of back-up help and also of a warrant. . . .

Finally, regarding the post-warrant search of the hotel room, the trial court found as follows:

A warrant was subsequently attained, search was made, heroin was found beside the TV in plain view, although it had not been seen previously by the officers while in the room. And heroin was also found under a chest of drawers.

The trial court then made conclusions of law, in pertinent part, as follows:

Law enforcement personnel gained consensual entry to the room through the actions and inactions of the Defendant.

While lawfully in the room, the officers observed sufficient evidence that, coupled with the conduct of the Defendant and [Brailford], and considering the two tips that had been received by the dispatcher and relayed to Wilson, [the] conduct of [Brailford] when he arrived in the [blue car] and made a trip to the room and back to the car and back up to the room, the three entries in the motel's night log, the conduct of [Brailford] when he observed the uniformed officer while looking out the motel window, the registration and the fictitious name, the reference in the registration to a 1981 California trailer, the evasive and erroneous responses of the Defendant when asked about his name, his age and the person to whom the room was registered, presence of scales in plain view in the room, and the totality of the circumstances surrounding this incident, the officers did have probable cause to believe that the commission of a crime was taking place. The Court further concludes that the officers lawfully froze the scene pending the issuance of a search warrant, that a search warrant was lawfully issued, the scene was lawfully searched and the evidence derived therefrom was lawfully

seized. Therefore, the Court holds that the Defendant's motion to suppress is denied.

On appeal, defendant brings forth five assignments of error, asserting that the trial court erred in concluding (1) the officers gained consensual entry to the hotel room; (2) the officers, while lawfully in the hotel room, made observations that, coupled with the totality of the circumstances, gave them probable cause to believe a crime was taking place; (3) the officers lawfully froze the room pending issuance of a search warrant; (4) the scene was lawfully searched, and evidence lawfully seized, pursuant to a valid search warrant; and (5) defendant's motion to suppress should be denied. After a thorough review of the record, we find each assignment of error to be without merit.

At the outset, we note that "[i]n reviewing the trial court's order following a motion to suppress, we are bound by the trial court's findings of fact if such findings are supported by competent evidence in the record; but the conclusions of law are fully reviewable on appeal." *State v. Smith*, 346 N.C. 794, 797, 488 S.E.2d 210, 212 (1997); *see also State v. Mahatha*, 157 N.C. App. 183, 191, 578 S.E.2d 617, —— (2003).

It is axiomatic that unreasonable searches and seizures are prohibited by both our federal and state constitutions. U.S. Const. amend. IV; N.C. Const. art. I, § 20. Generally, warrantless searches are not allowed absent probable cause and exigent circumstances, the existence of which are factual determinations that must be made on a case by case basis. *State v. Harris*, 145 N.C. App. 570, 580-81, 551 S.E.2d 499, 506 (2001), *disc. review denied*, 355 N.C. 218, 560 S.E.2d 146 (2002). "Consent, however, has long been recognized as a special situation excepted from the warrant requirement, and a search is not unreasonable within the meaning of the Fourth Amendment when lawful consent to the search is given." *Smith*, 346 N.C. at 798, 488 S.E.2d at 213 (1997) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 36 L. Ed. 2d 854 (1973)). Further, N.C. Gen. Stat. § 15A-221(a) (2001) authorizes warrantless searches and seizures "if consent to the search is given." N.C. Gen. Stat. § 15A-221(b) (2001) defines "consent" as "a statement to the officer, made voluntarily . . ., giving the officer permission to make a search."

In considering whether a defendant's nonverbal conduct alone, absent any words evidencing consent, may constitute valid consent to a search, this Court has held as follows:

In determining whether under the totality of the circumstances defendant's nonverbal response in this case constituted a statement within the meaning of consent under N.C. Gen. Stat. § 15A-221(b), we are guided by *Black's Law Dictionary* definition of the word "statement" as "a verbal assertion or nonverbal conduct intended as an assertion." *Black's Law Dictionary*, 1416 (7th ed. 1999). Thus, a statement need not be in writing *nor orally made. Rather, the use of nonverbal conduct intended to connote an assertion is sufficient to constitute a statement.*

*State v. Graham*, 149 N.C. App. 215, 219, 562 S.E.2d 286, 288 (2002), *disc. review denied*, 356 N.C. 685, —— S.E.2d —— (2003) (emphasis added). In *Graham*, this Court upheld the trial court's conclusion that the defendant voluntarily consented to a warrantless search of his person where the defendant, after being asked by a police officer if she could search his pants pocket, did not reply verbally but rather "stood up and raised his hands away from his body accompanied by a gesture which [the officer] took to mean consent." *Id.* This Court then affirmed the denial of Graham's motion to suppress the evidence seized as a result of the search.

**[1]** In the case *sub judice*, we conclude that, as in *Graham*, defendant's nonverbal response after Detective Wilson knocked on the hotel room door, identified himself as a police officer, engaged in conversation, and asked to come in constituted a valid consent for Detective Wilson and Officer Robinson to enter. The trial court found that defendant initially "opened the door slightly, a crack" when Detective Wilson knocked. As they talked, the door "opened slightly more," but defendant remained "in a posture suggesting [he] did not want Wilson to enter." However, after Detective Wilson "asked if he could step into the room," defendant "stepped back from the threshold . . . , the door opened to its full extension. The Defendant said nothing . . . [Defendant's] hand was still on the doorknob, but his body had moved and the door had opened to its full extent." After the officers entered "[t]he Defendant was cooperative and cordial." There is ample evidence of record supporting the trial court's findings of fact. Defendant does not now contend, nor does the record reflect, that he lacked authority to consent to the officers' entry or that his consent was obtained through duress or coercion. Viewing this evidence under the totality of the circumstances, we hold that the trial court properly determined that defendant voluntarily consented to the officers' entry into the hotel room.

**[2]** Defendant contends that the warrantless search conducted by the officers after they entered the room was illegal, and that the evidence resulting therefrom should be suppressed. We disagree. In North Carolina, the plain view doctrine authorizes the lawful seizure of evidence without a warrant "when the officer was in a place he or she had a right to be at the time the evidence was discovered, it is immediately obvious that the items observed are evidence of a crime, and the discovery is inadvertent." *State v. Bone*, 354 N.C. 1, 8, 550 S.E.2d 482, 487 (2001), *cert. denied*, 535 U.S. 940, 152 L. Ed. 2d 231 (2002).

In the instant case, the trial court found that "Wilson saw scales in the room in plain view." Detective Wilson testified that he "saw a set of scales sitting on the night stand . . . as I was standing at the threshold of the door." Whether he observed the scales while standing at the threshold or after crossing it is immaterial, given our holding that defendant consented to the officers' entry. Either way, Detective Wilson was in a place where he had a right to be when he observed the scales. Detective Wilson testified that he knew scales such as these were often used by dealers to measure quantities of illegal narcotics. While such scales are not *per se* illegal, "scales and balances" are included within the definition of "drug paraphernalia" found in the Controlled Substances Act. N.C. Gen. Stat. § 90-113.21(a)(5) (2001). Immediately prior to seeing the scales, Detective Wilson had received information that the occupants of Room 210 possessed drugs, and he had detected and observed behavior by the room's occupants indicative of drug-related criminal activity. Here, under the totality of the circumstances, we conclude that it was immediately obvious to Detective Wilson that the scales were evidence of a drug crime. Finally, since the officers had no reason to know that they would observe scales when they asked if they could enter the room, we conclude that their discovery was inadvertent. *Bone*, 354 N.C. at 9, 550 S.E.2d at 487. We hold that the scales were lawfully observed and subsequently seized under the plain view doctrine.

**[3]** Next, defendant contends that the officers engaged in a constitutionally impermissible search by lifting the mattresses and opening the night stand drawer prior to obtaining a search warrant. It is well settled that "just because officers can justifiably enter a dwelling, that does not give them free rein in their search of the dwelling. The question becomes whether the scope of the ensuing searches was permissible." *State v. Woods*, 136 N.C. App. 386, 392, 524 S.E.2d 363,

367, *disc. review denied*, 351 N.C. 370, 543 S.E.2d 147 (2000). However, a warrantless search is not unconstitutional when there is probable cause to search and circumstances render impracticable a delay to obtain a warrant. *State v. Nance*, 149 N.C. App. 734, 743, 562 S.E.2d 557, 564 (2002).

In the case *sub judice*, we agree with the trial court's conclusion that after entering the room, the officers, under the totality of the circumstances, did have probable cause to believe that a drug crime was being committed therein, and were justified in "freezing" the scene pending issuance of a search warrant. *State v. Sanchez*, 147 N.C. App. 619, 622, 556 S.E.2d 602, 606 (2001), *disc. review denied*, 355 N.C. 220, 560 S.E.2d 358 (2002). The record is replete with evidence supporting the findings which in turn support this conclusion, as set forth in detail above.

The United States Supreme Court has cited immediate danger to the lives of law enforcement officers as an exigent circumstance justifying a warrantless search. *Warden v. Hayden*, 387 U.S. 294, 298-99, 18 L. Ed. 2d 782, 787 (1967). Here, the trial court's findings establish that defendant and Brailford "appeared interested in a particular area of the room around the night stand between the beds," and Detective Wilson testified they repeatedly moved towards this area. Both Detective Wilson and Officer Robinson testified that they were concerned that weapons might be hidden in this area of the room, and they consequently feared that waiting for a warrant before searching this area placed them in danger. The search was limited to places within this part of the room where the officers could have reasonably expected weapons to be concealed—under mattresses and seat cushions, and inside a drawer. The drugs and money found as a result of this search were left in place and not seized until a warrant was obtained. We conclude that Detective Wilson's warrantless search of the "lunge area" within the part of the room defendant and Brailford repeatedly moved toward was justified under the exigent circumstances exception to the warrant requirement, and that the scope of the search was permissible.

Having determined that both the officers' warrantless entry into the room and subsequent search of the "lunge area" were lawful, we find no merit in defendant's contention that the subsequently-issued search warrant was obtained using illegally obtained information.

Affirmed.

Judges MARTIN and HUDSON concur.