IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-336

Filed 17 December 2024

Carteret County, Nos. 21CRS052640-41

STATE OF NORTH CAROLINA

v.

JEFFREY LEE JOHNSON

Appeal by Defendant from judgments entered 12 October 2023 by Judge Phyllis M. Gorham in Carteret County Superior Court. Heard in the Court of Appeals 9 October 2024.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Brenda Menard, for the State-Appellee.*

*W. Michael Spivey for Defendant-Appellant.*

COLLINS, Judge.

Defendant Jeffrey Lee Johnson appeals from judgments entered upon guilty verdicts of one count of felony cruelty to animals and two counts of misdemeanor cruelty to animals. Defendant argues that the trial court plainly erred by concluding that a warrantless search of his home's curtilage was reasonable due to exigent circumstances and by denying his motion to suppress the evidence seized as a result of that search and the search of his home. We find no error, much less plain error.

## I.  Background

Defendant was indicted for two counts of felony animal cruelty and three counts of misdemeanor animal cruelty.  Defendant moved to suppress all evidence seized during the search of his property.  The evidence presented at the suppression hearing tended to show the following:

Carteret County Animal Control Officer Tyler Harvill received a phone call reporting a strong smell coming from Defendant's property and concern that there might be a deceased dog on the property.  Harvill discovered that Defendant was on probation as a result of being found guilty of cruelty to animals.  As conditions of Defendant's probation, he was required to allow reasonable searches of his home and yard concerning animals on his property and was prohibited from abusing animals by withholding food or water.

Harvill immediately attempted to reach Defendant by phone but received no response; he left a voicemail.  Harvill contacted Carteret County Deputy Sheriff Jessica Newman and requested her assistance with checking on several dogs at Defendant's property.  He told Newman of Defendant's conviction for animal cruelty and his probation conditions.

Harvill and Newman drove to Defendant's home.  Harvill parked his car just past Defendant's driveway.  "[E]ven from next to the road" he could smell ammonia and feces coming from Defendant's property.  Newman drove separately to Defendant's property.  She testified, "As soon as I got out of my patrol car, I could

smell a very, very strong odor of ammonia and feces and what I associate with, my experience being, just the smell of rot." The property had overgrown brush and "a lot of trash and building construction materials piled up." Newman could see animals throughout the front of the property and was concerned about them being dirty.

Because Harvill and Newman had been unable to reach Defendant and were concerned about a potentially dead animal on the property, the officers walked up the driveway toward Defendant's home to attempt to make contact with Defendant. When they reached the end of the driveway, they encountered Chubby, a Pitbull attached to a heavy chain that was driven into the ground.

Chubby's neck was "very irritated"; he had "a lot of missing fur"; his teeth "were worn down to the gumline"; he had overgrown toenails, one of which was "enlarged, red, and appeared to be infected"; and "[h]e had scabs on his body [in] various stages of healing." Chubby did not have any food or water nearby.

The officers could see other dogs on the property. "[T]hey all had similar . . . hair loss and overgrown nails, and their teeth were worn down severely. They all pretty much had the same setup." The officers could also hear dogs barking from various points on the property. Newman walked toward the sound of barking puppies. She found puppies in a box filled with fresh and dried feces. The water buckets inside the box were too tall for the puppies to reach over.

One of the officers knocked on Defendant's front door but got no response. They could hear a dog barking inside. Newman stood on a pile of trash and a freezer next

to the door to look inside Defendant's window for the dog. As she did this, "the smell of ammonia and feces increased significantly to the point [she] felt physically sick." "[T]he residence was very dirty. The floor was coated in dirt. There were piles of feces. It was just very dirty, and there was a lot of trash." The barking dog was positioned to the side of the window.

The officers headed into the backyard to check on the other dogs, because they were concerned for the dogs' safety. The dogs in the backyard "did not appear to be in good condition." One of the dogs had a large tumor above its tail. Several dogs had "their teeth worn down to the gumline, some of them, including their canine teeth; missing fur on the majority of the dogs; scabs on the majority of the dogs; overgrown toenails on the majority of the dogs." Some of the dogs had water, others did not, and others had dirty water. Some of the water bowls were placed on top of the dogs' shelters and the dogs were not in good enough condition to get on top of the shelters to reach the bowls.

As she was looking around, Newman noticed a chain leading into a dog shelter created out of a barrel. She walked over to it and saw a dog inside. She initially thought the dog was deceased. She called out to it, but there was no reaction. Newman testified:

> I got closer to the dog. Her name is Emmie. I bent down and I watched. I could see her breathing very shallow. Continued trying to get her attention. She didn't react. I ended up putting my hand on the chain and kind of rustling the chain, and she slowly started to react.

- 4 -

. . . .

> She picked her head up, looked at me. She began to try to get up to step out of the crate, the barrel. She was very uneasy on her feet. She actually stumbled and fell a couple of times as she was walking out.

. . . .

> She looked terrible. Again, her teeth were very worn down to the gums. Her ears had both been -- they're very short-cropped ears. The ears were both bleeding. Both ears had open wounds that were bleeding. She had the most missing fur. You could see her skin and several patches throughout her entire body. She had a large mass on her left thigh that was oozing blood and -- and fluid, and her toenails were so overgrown that it actually changed -- it contorted her toes. Her paw didn't just sit flat on the ground.

Newman called the magistrate and sent over some photographs of the dogs. The magistrate found probable cause to charge Defendant with animal cruelty and probable cause to take the dogs at that time for their safety. Newman also spoke with Animal Control and explained her intention to get the animals to the Humane Society for safekeeping and veterinary care.

At that point, Defendant arrived home. He was "not receptive to having a conversation," and Newman placed him under arrest. After taking Defendant to the Carteret County Detention Center, Newman applied for, and received, a warrant to search Defendant's home. Inside the home, Newman found two dogs, Weezy and Peezy, both of whom were in horrible physical condition. No food or water was available to the dogs.

Ultimately, twenty-one dogs were seized from Defendant's property. The vast majority of the dogs needed immediate veterinary assistance. Emmie was immediately euthanized based on veterinary recommendation. Weezy was also euthanized after the removal of her bladder stones did not sufficiently treat her poor health.

The trial court denied Defendant's motion to suppress, finding facts consistent with those recited above and concluding that the search was not unreasonable based on exigent circumstances. The case proceeded to trial. The jury found Defendant guilty as charged. Defendant was sentenced to 8-to-19 months of imprisonment for the felony cruelty to animals conviction and to two 120-day sentences for the two misdemeanor cruelty to animals convictions, all to run consecutively. The trial court suspended the sentences with an active sentence of 90 days, and Defendant was placed on special supervised probation for 48 months. Defendant appealed in open court.

## II.    Discussion

Defendant contends that the trial court plainly erred by denying his motion to suppress evidence seized as a result of the warrantless search of the curtilage of his home and of his home. Defendant's arguments are wholly meritless.

### A. Standard of Review

When a defendant fails to preserve an issue relating to a motion to suppress but "specifically and distinctly" contends plain error, this Court reviews the issue for

plain error. *State v. Powell*, 253 N.C. App. 590, 594 (2017); N.C. R. App. P. 10(a)(4). "For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial." *State v. Lawrence*, 365 N.C. 506, 518 (2012). "To show that an error was fundamental, a defendant must establish prejudice-that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty." *Id.* (quotation marks and citations omitted).

"In reviewing a motion to suppress evidence, this Court examines whether the trial court's findings of fact are supported by competent evidence and whether those findings support the conclusions of law." *State v. Alvarez*, 385 N.C. 431, 433 (2023) (citation omitted). "Conclusions of law are reviewed de novo." *Id.*

**B. Applicable Search and Seizure Law**

The Fourth Amendment protects individuals "against unreasonable searches and seizures" by the government. U.S. Const. amend. IV. No unreasonable search occurs when "an officer is in a place where the public is allowed to be, such as at the front door of a house. It is well-established that entrance by law enforcement officers onto private property for the purpose of a general inquiry or interview is proper." *State v. Lupek*, 214 N.C. App. 146, 151 (2011) (quotation marks, brackets, and citation omitted). "When law enforcement observes contraband in plain view, no reasonable expectation of privacy exists, and thus, the Fourth Amendment's prohibition against unreasonable warrantless searches is not violated." *State v. Grice*, 367 N.C. 753, 756 (2015) (citation omitted). Moreover, an officer may seize evidence under the plain

view doctrine when "the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed; . . . the evidence's incriminating character . . . was immediately apparent; . . . the officer had a lawful right of access to the object itself; . . . [and] the discovery of evidence in plain view [was] inadvertent." *Id*. at 756-57 (quotation marks and citations omitted).

When an officer is not in a place where the public is allowed to be, "[t]he governing premise of the Fourth Amendment is that a governmental search and seizure of private property unaccompanied by prior judicial approval in the form of a warrant is *per se* unreasonable unless the search falls within a well-delineated exception to the warrant requirement involving exigent circumstances." *State v. Cooke*, 306 N.C. 132, 135 (1982) (citations omitted). "Exigent circumstances exist when there is a situation that demands unusual or immediate action and that may allow people to circumvent usual procedures." *State v. Nance*, 149 N.C. App. 734, 743 (2002) (quotation marks, brackets, and citations omitted). "If the circumstances of a particular case render impracticable a delay to obtain a warrant, a warrantless search on probable cause is permissible . . . ." *State v. Allison*, 298 N.C. 135, 141 (1979) (citations omitted). Exigent circumstances exist where an officer reasonably believes that an animal on the property needs immediate aid. *Cf. Nance*, 149 N.C. App. at 743-44 (analyzing whether exigent circumstances existed for animal control officers to enter defendant's property and seize horses located thereon and ultimately concluding they did not because the "animal control officers had ample time during

the three days after [first] viewing the horses in which to secure a warrant, but neglected to do so because they mistakenly believed it to be unnecessary"). *See Morgan v. State*, 645 S.E.2d 745, 749 (Ga. Ct. App. 2007) (holding that the Fourth Amendment does not bar a police officer from making a warrantless entry and search when they reasonably believe an animal on the property needs immediate aid).

### 1. *Search of Defendant's Curtilage*

Here, Harvill received a phone call reporting a strong smell and the potential for a dead animal on Defendant's property. He discovered that Defendant had been convicted of cruelty to animals and was on probation. Harvill called Defendant but Defendant did not answer. Harvill called Newman, and upon their arrival at Defendant's property, they immediately smelled ammonia and feces; Newman smelled rot. The property was overgrown with brush, and a lot of trash and building construction materials were piled up. They could see animals "throughout the front of the property."

The officers walked up Defendant's driveway toward his home. At the end of the driveway, they encountered Chubby, who was chained up and in poor physical condition with no food or water. They could see other dogs on the property in similar condition with "pretty much . . . the same setup." They could hear puppies barking in a nearby box, dogs barking from various points on the property, and a dog barking inside the home. When the officers knocked on the door, they got no response. Next to the door, "the smell of ammonia and feces increased significantly to the point

[Newman] felt physically sick."

At this point, no unreasonable search had occurred as Newman was "in a place where the public is allowed to be" when she walked up Defendant's driveway and onto the porch. *Lupek*, 214 N.C. App. at 151. Furthermore, the seizure of Chubby and the other dogs visible on the property was justified under the plain view doctrine: Newman did not violate the Fourth Amendment in arriving where Chubby was chained to the ground and the other dogs were visible; it was immediately apparent from Chubby's and the other dogs' conditions that Chubby and the other dogs were evidence of animal cruelty; Newman had a lawful right of access to Chubby and the other dogs; and the discovery of Chubby and the other dogs in plain view was inadvertent. *See Grice*, 367 N.C. at 756-57. Additionally, the circumstances abundantly supported a reasonable belief that the dogs on the property needed immediate aid to prevent further serious injury or death such that exigent circumstances justified Newman's warrantless entry into the areas of Defendant's property where the dogs were located.

Likewise, once Newman observed the seriously deprived condition of the dogs, she was entitled to respond to the dire emergency situation by having the dogs immediately seized so that they could be transported for emergency medical treatment. Accordingly, under these circumstances, the prevention of the continued needless suffering and death of the dogs on Defendant's property created exigent circumstances justifying the warrantless search and seizure of the dogs. *See, e.g.*,

*Morgan v. State*, 656 S.E.2d 857, 860 (Ga. Ct. App. 2008) (affirming exigent circumstances existed where malnourished and mistreated animals were observed on the property, a neighbor had reported mistreated animals on the property, and harsh weather conditions existed, giving the deputy "a reasonable belief that the dogs heard barking in the backyard were in need of immediate aid to prevent their serious injury or death").

We further note that, given the plain view discoveries of Chubby and the other dogs on the front of the property, there was a substantial basis for probable cause to search the backyard and inside the house. Indeed, Newman applied for and received a search warrant to search the residence, storage units, barns, sheds, outbuildings, and person(s) at Defendant's property. Thus, even if exigent circumstances had not justified the search of the backyard and seizure of the dogs therein, the dogs would have been seized inevitably upon Newman securing and executing the search warrant for the premises; the inevitable discovery rule therefore applies. *See State v. Wells*, 225 N.C. App. 487, 490 (2013) ("Under the inevitable discovery doctrine, evidence which is illegally obtained can still be admitted into evidence as an exception to the exclusionary rule when the [evidence] ultimately or inevitably would have been discovered by lawful means." (quotation marks and citations omitted)).

For these reasons, the trial court did not err, much less plainly err, by denying Defendant's motion to suppress evidence seized as a result of the warrantless search of the curtilage of Defendant's home.

## 2. *Search of Defendant's Home*

Defendant also asserts that the trial court plainly erred by denying his motion to suppress evidence seized as a result of the search of his home because the warrant was based on evidence seized from an unconstitutional search of the curtilage of his home. However, because the search of Defendant's curtilage was not unconstitutional, the warrant obtained to search Defendant's home was not based on evidence obtained by an unconstitutional search. Accordingly, the trial court did not err, much less plainly err, by denying his motion to suppress.

## III.  Conclusion

No unreasonable search occurred when Newman walked up Defendant's driveway and onto the porch, and the seizure of Chubby and the other dogs visible on the front property was justified under the plain view doctrine. Furthermore, exigent circumstances justified the warrantless search of Defendant's backyard and the seizure of the dogs found there. Finally, given the plain view discoveries of Chubby and the other dogs on the front property, even if exigent circumstances had not justified the backyard search and seizure of the dogs therein, the inevitable discovery rule applies. Accordingly, the trial court did not err, much less plainly err, by denying Defendant's motion to suppress.

NO ERROR.

Chief Judge DILLON and Judge CARPENTER concur.